UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 24 CR 521(GRB)

-against- : United States Courthouse
: Central Islip, New York

JACOB ISRAEL WALDEN,

Defendant. : January 22, 2025
: 12:00 PM

- - - - - - - - - - - - - - - - X

CRIMINAL CAUSE FOR ARRAIGNMENT AND BOND HEARING
BEFORE THE HONORABLE GARY BROWN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: UNITED STATES ATTORNEY'S OFFICE
EASTERN DISTRICT OF NEW YORK
225 Cadman Plaza East
Brooklyn, New York 11201
BY: LEONID SANDLER, ESQ.

For the Defendant: BRAFMAN & ASSOCIATES, PC
256 Fifth Avenue, Suite 2nd Floor
New York, New York 10001
BY: BENJAMIN BRAFMAN, ESQ.

SAUL BIENENFELD, ESQ.
680 Central Avenue, Suite 108
Cedarhurst, New York 11516

Court Reporter: Lisa Schmid, CCR, RMR
Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

COURTROOM DEPUTY: Calling Case Criminal 2024-521, USA versus Jacob Walden.

Counsel, please state your appearance for the record.

MR. SANDLAR: Good morning, Your Honor. Lenny Sandlar for the United States. With me is Tara Sarnelli from Probation -- Pretrial Services.

THE COURT: Your name again, counsel?

MR. SANDLAR: Lenny Sandlar, Your Honor.

THE COURT: First time here?

MR. SANDLAR: Yes, sir.

THE COURT: Welcome.

MR. SANDLAR: Thank you.

THE COURT: Counsel?

MR. BRAFMAN: Good morning, Your Honor. Benjamin Brafman and Saul Bienenfeld, and Mr. Walden is present, Your Honor.

THE COURT: Very good. Make yourselves comfortable.

And Mr. Brafman, I can be clear: It's not your first time here.

MR. BRAFMAN: I understand, Your Honor.

THE COURT: Welcome back.

MR. BRAFMAN: Thank you very much. It's always a privilege to be here.

THE COURT: Same here. Have a seat, please.

All right. So on the agenda today, we have an arraignment on the Indictment as well as a discussion of detention. Yes?

MR. SANDLAR: That's correct, Your Honor.

THE COURT: All right. Let's start with the arraignment piece. Let's get that out of the way.

All right. So Mr. Brafman, I assume we're waiving public reading of the indictment?

MR. BRAFMAN: Yes, sir.

THE COURT: All right. So let me address the defendant.

Sir, first of all, have you had a reasonable opportunity to talk with your attorneys and do you understand what we're doing here today?

THE DEFENDANT: Good afternoon. Yes, Your Honor.

THE COURT: All right. Good afternoon.

And sir, you do understand you have been charged in an Indictment -- I'm not going to read the whole thing -- but it charges a number of -- I'll call them child pornography offenses, including manufacture of child pornography, allegedly.

I don't need to hear whether you did it. I just want to know whether you understand that those are the

charges.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Mr. Brafman, we're entering not guilty pleas as to all counts. Yes?

MR. BRAFMAN: Yes, sir.

THE COURT: All right. That will be entered.

So that gets us to the bail portion of the program. Why don't you be seated.

I'll let the Government go first because you are making a detention application, correct?

MR. SANDLAR: That's correct, Your Honor.

THE COURT: Okay. So why don't you go ahead first.

Before I do that, let me just remind the Government, to the extent I haven't done it or the magistrate hasn't done it, under Rule 5, you have extensive discovery obligations, and you'll be held accountable for not following them if you do not. I'm sure you will. But it is my obligation to remind you of that. Yes?

MR. SANDLAR: Yes, Your Honor. So heard and understood, and will follow that directive.

THE COURT: Excellent.

All right. So why don't -- I've read your application, but why don't you go ahead and make whatever

presentation you would like to make.

MR. SANDLAR: Sure. Thank you, Your Honor.

We made the application at this stage following the Indictment. As Your Honor saw from our written submission, the defendant was previously arrested on a single-count charge of possession over the course of the summer.

At the time, the magistrate judge, Judge Bulsara at the time, who is now a district judge here, assessed the facts and determined that even though at the time the defendant was merely charged with possession, the record was sufficient to support bail conditions to include Adam Walsh conditions. So the defendant since his arrest has been on home detention, cyber monitoring, and numerous restrictions.

Now that the Indictment has been returned by a grand jury here in Central Islip, the charges are much more serious. The defendant is not charged merely with possession, as he was earlier. He's now not charged with multiple counts of possession and access as well as receipt, which carries a five-year statutory minimum, as well as and most seriously, two counts of production with two identifiable victims. For that reason, the Government now moves for detention.

The offense conduct is very serious, as outlined

in the bail -- excuse me, in the detention memo. The defendant over the course of years has attempted to contact, contacted, attempted to entice and successfully enticed minors through the internet to produce new child pornography for him, typically in exchange for payment.

Two of those victims are identified in an anonymized manner in Count One and Count Two. The defendant also purchased a vast amount of child sexual abuse material from online resellers and online producers through the internet.

That -- those counts come -- have the statutory presumption which the Government clearly identified in the detention submission, and the burden now falls to the defendant to rebut that presumption, the presumption of dangerousness and the presumption of flight.

I read the defendant's voluminous submission over the weekend, Your Honor. There are five medical professionals who write in a voluminous manner in support of the defendant. Some of them, for example, describe the defendant's own abuse as a child, which I was sorry to hear. Some of them describe his past course of treatment for his multiple addictions. Some of them describe his current treatment for his conditions, and described a detriment that would be caused to the defendant should he be detained before trial.

When I read the submissions, Your Honor, it -- a few thoughts occurred to me. Number one, certainly, none of these voluminous submissions by five different medical professionals are tested. These are self -- reports based on self-reports of the defendant and evaluations by medical professionals hired by the defendant to evaluate the defendant based on his own self-reports.

And ultimately in some manner, it read to me similar to what a sentencing submission would read.

THE COURT: I will say this. I obviously read everything that was submitted. I do agree with you, it did have the feel of a sentencing submission in some ways. I'm not sure how that cuts for today's purposes, but --

MR. SANDLAR: Sure. I think how that cuts, Your Honor, is that we have the charges. We have the statutory rebuttable presumption, and the burden is now on the defendant to rebut that presumption.

And therefore, I think the question before Your Honor is, does this voluminous submission -- which sounds like a sentencing submission -- rebut that presumption?

Reading through the submissions -- I think there are five substantive submissions: Exhibits A, B, C, D and E. There's also another exhibit, which at least as I receive it, didn't have a letter assigned it. Never mind, however.

THE COURT: There was also a polygraph exam in there.

MR. SANDLAR: There was also a polygraph exam, exactly, attached to one of those submissions.

The question is, what do we do with this submission as it relates to the Bail Reform Act, as to the presumption and the factors that the Court must consider at this hearing?

THE COURT: Let me stop you one second because I'm trying to weigh the various burdens here, and it gets a little complicated.

The new charges in the Indictment, do they -- I think the Government has shown based on the proffer substantial evidence, significant evidence to support those charges, but the question is, how does it affect the statutory penalties, in other words, the charges now versus the charges as they were initially?

MR. SANDLAR: Sure.

So before, Your Honor, the defendant was only charged with possession, which has no minimum.

THE COURT: Right. So there's a zero to five? What is it?

MR. SANDLAR: I'll double-check, Your Honor.

THE COURT: Okay. Go ahead.

MR. SANDLAR: Now he's charge with receipt --

that's Count Three -- that has a five-year mandatory minimum. And of course, production or sexual exploitation of children as it's more formally known in violation of 18 USC 2251(a), which has a 15-year mandatory minimum. These are -- I think the defense will agree, these are serious charges that trigger the presumption.

As it are relates to your question, Your Honor, what do we do with the defendant's submission? I tried to make sense of it and think to myself, which factors does it rebut, if any? And I think to the degree that it addresses any factors, it addresses the third factor under 3142(g)(3), which is the history and characteristics of the defendant. The submissions explain again the defendant's background, his medical condition, and his treatment; however, a couple things to note, Your Honor.

Number one, in some way, the submissions are consistent with the Government's theory. The Government said in the detention memo it has concerns about the motivated, determined, compulsive manner in which the defendant acted before both before he was charged and since he was charged. In many ways, the defense submission is consistent with that observation by the Government.

The polygraph, Your Honor, as Your Honor well knows is not admissible, and therefore, while perhaps it

could be considered at a bail proceeding, the weight is *de minimus* as other courts have observed.

THE COURT: I'm not going to exclude it for admissibility. I'm not sure the right questions are asked, but it is what it is, so --

MR. SANDLAR: That's correct, Your Honor.

In short, Your Honor, the totality of the defense's voluminous submission does not rebut the presumption of dangerousness and risk of flight. Your Honor has observed much of the same on very similar facts, I should say, in the *Blackman* case that the Government cites.

THE COURT: I was thinking about *Blackman*. Yep.

MR. SANDLAR: The Government raised that in the submission. The defense does not address that case or the Court's observation on very similar facts, which is a defendant who is actively soliciting the creation of new child pornography through the internet.

The defense's response appears to be that, well, it's not hands-on here in Central Islip. It's not here in Nassau County.

But the Court -- as the Court observed in its ruling then, there is not a cognizable difference certainly under the statute between production of child sexual abuse material live and hands-on versus the

production of child sexual abuse materials through the interest. That's a distinction that the defense tries to draw that is not cognizable, so far as I could tell, neither in the Court's opinion, *Blackman*, that is, nor under the statutes with which the defendant was charged.

In short, Judge, I will wrap up to say that the defense submission does not rebut the statutory presumption of dangerousness. That dangerous is cognizable. The Court recognized it on very similar facts, and given the presumption and absence of it being rebutted, the defendant should be detained pretrial.

Thank you very much, Your Honor. The Government is available to address any questions.

THE COURT: You're not sitting down yet. I've got questions.

In your letter, you say the following -- and I'm going to read this statement into the record because it's important for a number of reasons.

You say, during the investigation, law enforcement also identified at least 11 minor female victims, ages 14 to 17 years old, whom Walden contacted, paid, and enticed or attempted to entice to produce CSAM -- which is the Government's abbreviation for child pornography -- via social media from at least 2020 to 2024.

You're representing to me you have -- that those are facts that you can prove? Yes?

MR. SANDLAR: Those are facts that the investigation revealed. A subset of those facts was charged in this Indictment.

THE COURT: Right. Should I draw any conclusion from the fact that only a subset was charged?

MR. SANDLAR: There is no conclusion to be drawn except that the Government must charge readily provable, most serious offenses, which it charged in those counts. Those are the most readily provable; however, the conduct is far broader than the six-count complaint.

THE COURT: Okay. Does -- when you use the phrase, from 2020 to 2024, did any of that conduct occur after his arrest?

MR. SANDLAR: Sitting here today, I don't have any evidence of that conduct occurring after the defendant was arrested this summer.

THE COURT: Okay. Of course, there is other conduct which has been identified by Pretrial Services and so forth --

MR. SANDLAR: Correct.

THE COURT: -- that I'm aware of.

Okay. I think that's all I have for you for now.

MR. SANDLAR: Thank you, Your Honor.

THE COURT: Don't go anywhere. Okay?

Mr. Brafman?

MR. BRAFMAN: Yes, sir?

THE COURT: I'll hand the floor over to you, sir.

MR. BRAFMAN: Your Honor, if I may, first, when the Government dismisses the psychiatric and psychologist reports because it relies on self-reporting by the defendant, I don't understand how you can dismiss those reports because anytime a psychiatrist interviews a defendant, they rely in substance on what the defendant tells them, and they don't -- the Government does not suggest that these psychiatrists or psychologists are ineffective or incapable of doing their job in a professional manner, and the reports that we submitted are not rebutted by any reports submitted by the Government who had the opportunity to challenge these experts or to provide any reports of their own.

I also indicate, Judge, respectfully, that the Government has not yet complied with their discovery obligations because neither Mr. Bienenfeld nor I have had an opportunity to actually view the films or the electronic chats that the Government suggests.

I understand that the Government may proceed on

a proffer at a detention hearing, but most respectfully, when they look to demonstrate that a defendant is entitled to a fifteen-year mandatory minimum for essentially producing or enticing, I think those words are subject to challenge if we could view the materials. So if we viewed them and had the opportunity to make these arguments, we might better be able to rebut the presumption. I also suggest with respect that how one can rebut the presumption is what we try to do.

The defendant has been under house arrest with careful monitoring of all of his electronic devices. He has not violated any condition of house arrest since his arrest, and that is, essentially, a means by which we can rebut the presumption that there are no conditions that the Court could further impose.

We have also offered to increase the monetary portion of the bail. The house he lives in with his wife and five children is worth north of $2 million, based on my knowledge of the neighborhood they live in. So we're prepared to increase the bond to a million dollars or two million, whatever the Court deems appropriate.

Your Honor, the risk of flight, I think we have rebutted. The defendant is here today, knowing that the Government was going to move for his detention.

When the defendant's phone was seized at the

airport, he was going to Italy for a Passover program with his wife and children and he returned, knowing what the Government might find on his phone. So to suggest that he is a risk of flight is absurd. And he is here today, knowing that the Government was moving to detain him. So I think we take that factor out of the concern that the Court should consider in an application for detention.

With respect to risk to the community, we submit respectfully that all of the indications are that the defendant is continuing in therapy with the understanding that when he leaves to see a doctor, he notifies Pretrial Services. When he returns, he returns when they expect him.

And most respectfully, Judge, we have several prominent psychiatrists who have been treating Mr. Walden for several months. It's almost six months now without any violations since his arrest, and I ask Your Honor to consider that fact. So to the extent that the Government suggests that there are no conditions of bail that can be imposed to protect the community, I think they are simply wrong.

I also indicate to the Court that we have examined the Bureau of Prisons facilities that have sex offender treatment programs, and we have identified many of them that have specific programs to treat someone who

is a sex offender, and that would be where a defendant would be detained if he was convicted.

Now, Your Honor, at this point, we have indications from at least two of the therapists that the MDC, with all of its other problems which I think the Court is aware of, does not have any sex offender treatment programs. So they would warehouse Mr. Walden under horrific conditions. And we ask Your Honor to consider that fact and not interrupt his therapy because at the end of this discussion, we ultimately have to submit a sentence memorandum to the Court on any of the counts that Mr. Walden may be convicted of.

I think part of the submission, we would prepare and further submit all of the reports that we have today documenting his continued therapy, and the fact that they seem to think that his therapy is working, and they indicate, Your Honor, that part of his compulsion arises because of the fact that he himself was abused for several years as a child.

They also think that the medicine he was being provided had the impact that it wasn't supposed to have, and that is, it furthered his compulsion, it increased his requirement of having sexual gratification.

And if someone has been under strict supervision for six months -- it's not like a day, Judge -- six months

is a long time. And to the extent that the Court is concerned that he poses a danger to the community, I think that would have manifested itself during the six-month period, and it hasn't.

So the Government coming in here with a statutory presumption that Your Honor should remand the defendant, we submit respectfully that we have done everything we can to try and rebut that presumption, and I think that the suggestion that we have not done so is, Your Honor, a wrong suggestion because the Government relies on the presumption.

They have not come forward with any medical evidence or any proffer which suggests that the defendant is a risk of flight, and I submit respectfully that they couldn't do that because the defendant is here today. He knew he was facing an order of -- an application for detention, which the Court might very well impose.

He is here today. He has numerous members of his family in the courtroom today. He has the support of a lot of people, including a prominent rabbi in the front row, Rabbi Bender, who is helping him deal with these issues, and we have met him in the defendant's home and they have had very deeply emotional conversations for an effort -- to try to explain to the defendant why his conduct is just inconsistent with what he should be doing,

not only violating the law, but violating the principles of an orthodox person who is otherwise a law abiding citizen.

I also note respectfully that he has no criminal record, he has no prior contact with the law enforcement or government. He takes care of numerous people in the community, and we would submit at the time of sentence -- and I have with me close to 75 letters from people who ask the Court to demonstrate leniency and compassion.

But I stress respectfully that if the Court orders detention, he doesn't go to a BOP facility that can continue the therapy that he is now getting. He will go to a BOP facility if he is ultimately sentenced by Your Honor, and to suggest that Your Honor remand him today, he would end up at the MDC, and with all of the other horrific problems that the MDC has already suffered and have been the subject of numerous court decisions that I know Your Honor is familiar with, where they have recommended that a defendant not be remanded to the MDC.

THE COURT: I think I wrote one of them.

MR. BRAFMAN: Yes, Your Honor. You did. And I think it's a very thorough decision, and I read it yesterday again. And I think Your Honor goes from A through X, and explains all of the problems that facility has, and I think Your Honor is probably more thorough than

in any of the other decisions where I read and the judges imposed the sentence, but did not remand someone to the MDC, and where a prison sentence was imposed, they directed that the defendant surrender to the facility designated by the Bureau of Prisons.

We have with me several BOP facilities, and their security level is low, medium and high, depending on the risk factors that they can assess.

So at the time the defendant is actually sentenced by the Court, not on a detention hearing but after conviction, if there is a conviction, where we have been able to see the materials, the Court has been able to see the materials and if, in fact, the Court determines that the defendant must be sentenced, you, I think, would sentence him to a facility that allows for the treatment that he is already receiving.

And I ask Your Honor not to interrupt that treatment because Mr. Walden is a relatively young man. He has five children. He has a wife who is present in court. They are to date supportive, recognizing the nature of the offense and the prominence of the case that has humiliated him within his own community.

So respectfully, I'm prepared to answer any questions the Court imposes -- the Court suggests to me, but I'm not begging -- you know, one of the prominent

lawyers who I deeply respect who is no longer alive said to me, when you buy your suits, order two pair of pants because you're going to spend most of your time on your knees.

Well, you know, I am on my knees and I am asking the Court in this case not to simply impose detention because the Government relies on a presumption.

And we come in here not without evidence to allow the Court to conclude respectfully that the defendant is having treatment. The treatment they suggest is helping him understand the nature of his crimes. They express to the Court that he demonstrates very serious remorse -- and yes, these are self-reporting, but I don't know how you get a report from a therapist without relying at least in part on what the defendant says to you.

They have provided Your Honor with test results that they have administered which demonstrate the defendant is not inclined to be a recidivist, and that he recognizes the nature of his problem and the nature of the issues that he himself has faced throughout his life. I ask the Court to allow him to continue in treatment.

I think in your opinion, you recognize the very, very difficult life a person would have to lead if, in fact, he was detained in the MDC.

I think this case has a shelf life of at least

several months before a decision is made, and we have to see the materials before a decision is made, whether there is any defensible aspect of this crime.

And relying on a Government's proffer, which I think the Court is permitted, I don't think in this case, it should be the end of the discussion because they haven't done a number of things which they are required to do: A, allow us to see the materials; B, if they wanted to ask for detention based on a presumption and when they have a number of professionals who have submitted their own detailed analysis and a treatment plan for Mr. Walden, none of them have suggested that the treatment is good if it is interrupted.

And I think, as Your Honor may well know, you make progress with a therapist and ultimately, I think they've demonstrated the need for it to continue, and I think they've also determined that the MDC is not the place for him to continue getting his treatment.

They also are reluctant to provide the kind of medications that they have now prescribed, which changes the prescription history of this case. And the materials that he was prescribed by doctors who meant well, but were just wrong helped not to treat his issues, but they exacerbated his condition.

So for all of those reasons, Judge, unless you

have specific questions --

THE COURT: Oh, I do. I do. So stand by.

So let me start with the risk of flight. That certainly is not my principal --

MR. BRAFMAN: I'm sorry?

THE COURT: The risk of flight is certainly not my principal concern, and I'm going to say I could -- I could dicker with you over the amount of the bond. Plaintiff is -- the defendant is somebody of substantial means. Whether that's a deterrent or not, I don't know, but I'm not so worried about that.

And I'll say that, of course, the increased mandatory minimums do increase that risk a little bit, but among other things, I'll note for the record, there are -- I'm going to rough it out at least, I would say two dozen, maybe three dozen people here in support of him.

Thank you all for coming. It's important.

And that's something that also tends to ameliorate somewhat -- somewhat the risk of flight, so I'm not too worried about that.

What I have to be concerned about -- what I have to be concerned about is the danger to the community. We're dealing with a different set of facts here than when he was first arrested.

Yes. I'm looking at the incredibly thorough

package you submitted. You did a great job, Mr. Brafman, as I've come to expect from you. But I have two questions.

One, when you talk about, Judge, you shouldn't interrupt his treatment, taking this out would be bad for him and so forth -- is that -- does that even go into the detention calculus?

And what I mean by that is this. We're talking about -- and again, according to the Government and it's a proffer, but it's a set of facts I need to accept for today's purposes -- they have identified 11 -- 11 girls aged -- between 14 and 17, who he actively solicited for the creation of child pornography. That's a significant risk. That's a significant -- significant danger.

When I'm looking at that danger, is the defendant's continued treatment even a factor that comes into this equation based on the case law? Do you know of anything that suggests that that is something we even need to think about today?

MR. BRAFMAN: I think the factor that Your Honor must also consider is that since his arrest, he has not attempted to contact any children, and the therapists are helping him deal with his issues.

He's also living in a family home that houses five children and his wife. So to address the issue of

bail, if he were to leave, that house would be forfeited -- but I think Your Honor is correct. That is not a factor that should require the detention today.

In terms of his danger to the community, that was before his arrest. And I think, Judge, in many of the cases that have required detention based on a presumption, there are facts that are different than the facts here today.

THE COURT: Mr. Brafman, let me just stop you for a second. When you say the Government's relying on the presumption, I don't think they're relying on the presumption alone. In other words, the AUSA said that.

I'm not relying on the presumption alone. The presumption is only a burden-shifting thing, right? Then you have to come forward with material, and you've come forward with material.

Whether there is still a question remaining there, I don't think it's the presumption alone. I mean, when I talk about those facts that I just set forth about the 11 minor female victims, we're not talking about a presumption case anymore. That's real. Those are significant numbers.

Then I have to ask you -- and this is what baffles me about this case -- the defendant is a person of substantial means, has a business, has a family and so

forth. You would think that the specter and the experience of a federal arrest for child pornography charges back in August would have been enough to say, I better knock it off.

But if I look at the report I have from Pretrial Services from August -- what was this. I'm sorry, September 5th of last year -- after his arrest, he's online. He's doing chats with females -- I don't know how old they are -- about sexual activities, and he's doing it in code, and they're not giving him access to certain computers that he has access to, that worries me more than anything else. In other words, if a federal arrest isn't going to say, knock it off, what will? My words today? I don't think so.

MR. BRAFMAN: Well, Your Honor, the facts in that case occurred shortly after his arrest before he was in therapy -- and the woman involved was in her thirties. And she was --

THE COURT: Do we know that? I don't know that.

MR. BRAFMAN: I know that, yes.

THE COURT: Well, okay. These are facts I wish somebody would tell me. But there are two women he was involved with.

MR. BRAFMAN: Yeah, but the first women wasn't available and she referred him to another woman, and I

know they had discussion and the Government has those discussions, but that was before, long before he was in therapy, was six months before, and since then, there is no further violation, and they moved to remand him based on that violation, and he wasn't.

And the bail wasn't changed. The conditions of supervision were increased and since that time, he has not engaged in any chats or engaged in any attempts to contact adult women or minor women. And that's six months of well-conditioned behavior and that --

THE COURT: Actually, it's five months ago where we had the problem. So it's a little less than that, so it's a little concerning to me.

MR. BRAFMAN: But Your Honor, the defendant, who has been confined to his home, you know, to the extent that that does not credit against any sentence Your Honor imposes, that is not the point.

I think the point is that we think he is going to be cured or carefully monitored, and is being carefully monitored, and I think that alone should be considered by Your Honor in considering why he no longer poses a threat to the community, and that's a sufficiently long time for him not to engage in any violations of the strict conditions imposed.

And I think, Judge, we're not turning him loose

into the community. We're putting him back on home confinement where he, I think, at this point is and belongs. I think the monitoring by Pretrial Services is effective. And I think the therapy is proving to be affective.

And whether the Court concludes that his conduct occurred in part because of his own sexual abuse as a child, as several of the therapists agreed that that was a Post-traumatic Stress Disorder, and that the medications he was receiving at the time further exacerbated his condition, that they now have weaned him off of those medications, that they are now very seriously monitoring every chat and every internet attempt. So he is complying with those conditions.

And all I'm asking, Judge, is not that he be released without any conditions. I'm asking that he not be sent to the MDC where, A, his therapy will not be continued; and B, his medications will not be continued in a timely manner; and C, he will also be encountering the numerous horrific conditions that were articulated by Your Honor.

So it's not me trying to wax eloquent on what is going on at the MDC. I think Your Honor carefully explained what you understand the conditions to be there.

So what I'm suggesting with respect if that if

the defendant is being sufficiently monitored so that he doesn't pose a danger to the community, that he continue in his therapy, he continue on the medications that they have prescribed, and I think we've taken risk of flight off the table, I assume, or we will, I hope, by the end of this discussion.

THE COURT: We certainly could get there. That's not the issue for me at all.

Let me ask you another question because Mr. Brafman, despite the fact that you filed a hefty submission, suffice it to say I read every word, every word, some of them more than once.

When I look at Dr. Liebowitz -- and forgive me. Dr. Liebowitz is his principal therapist or is one of them?

MR. BRAFMAN: One of them.

THE COURT: One of them.

And because there's sensitive issues in here, I'm not going to go through everything, but when I get to his conclusion and writes a sentence like this: While the path to sustained success may still present challenges, his progress thus far provides a foundation for optimism as he continues to evolve towards decreased compulsions and improved mental clarity.

That's not a lock, right? That's not a ringing

endorsement. That's a, oh, this is a risky thing, but it looks like we're doing okay. I don't know that I have the luxury of adopting a conclusion like that and saying, well, let's hope for the best.

MR. BRAFMAN: Your Honor, I think if you look at Dr. Fagin's report, she concludes that he does not pose a danger to the community. So we are not dealing with doctors who can give you a blood test and say, you know, you're sick, you're going to die or you're going to get well.

I mean, the area of mental health treatment, I think the Court recognizes is not a science, but it is as close to a science, I think, as we can provide you with. And I think the Government, to be candid, has not attempted to provide their own medical experts. So I think that, you know, we have five experts who have opined that they believe that his treatment should continue.

One or two of them have recognized that the MDC is not in a position to provide that treatment, and they also have addressed the underlying factors that may have caused the defendant, who is otherwise a law abiding respected citizen and a good parent and a decent man in the community, they have not been able to explain perfectly what caused him to have this condition, but they have done, I think, the best that they can do in

finalizing a report that we hope gives the Court some comfort that you're not turning loose a predator.

And I think if the choice is, you know, allowing him to continue in treatment and remain on house arrest and increase his bail, I think that is a responsible decision by Your Honor at this time.

And the Government is, in effect, relying on the presumption. They're really not providing you with any other indication that the defendant is a continuing threat to the community. And I ask Your Honor to err on the side of caution and not remand him.

But I think if he continues on bail with the increase in the monetary aspect, which can essentially put the home at risk of forfeiture, I think that should give Your Honor some comfort, and I think if the Court were to tell the defendant that should you find any violation -- any violation of the conditions where he has any contact with anyone for sex, whether they're old or young, that the Court would hear no further argument, and that the Court would immediately remand the defendant.

Look, Your Honor, absent a miracle or absent some really good lawyering, which we will try very hard to provide, I think --

THE COURT: You already are, sir.

Go ahead.

MR. BRAFMAN: I appreciate that, Judge.

But, you know, I think Your Honor needs to recognize that he's not being turned loose into the community. So to the extent that anyone suggests, as the Government has, that he poses a threat to continue in this behavior, I think the Court should be satisfied with the submission that there are several doctors who have concluded that treatment is best for him, and when you actually couple that with the conditions at the MDC, where he's going to be warehoused under horrific conditions, as Your Honor has yourself concluded in another case, I think the request for the bail to be continued with an increase in monetary indication or any other condition that Your Honor imposes with the exception of him being remanded, I think at this point is in the best interest of justice because I think Your Honor needs to consider not only the rights of the community, but the defendant's rights.

And right now, he's doing pretty well in the therapy that he has vowed to continue and the doctors have vowed to continue as well.

So I'm asking Your Honor not to -- finish that therapy and allow him to be warehoused because let's assume we're dealing with a couple of months before a decision is made as to whether he pleads guilty or goes to trial, any indication between now and then that he has

violated any condition that is imposed by the Court or Pretrial Services -- and they're doing a pretty good job of monitoring everything that he does on a computer or on the internet. They don't allow him to get away with anything.

And to the extent that he is remanded, in effect, to his house with his family at this point is, I think, a fair resolution of the Government's application, and I think you should reject their application for immediate detention.

THE COURT: Okay. Thank you.

Any response, counsel?

MR. SANDLAR: Judge, yes, in brief, a couple of observations.

Number one, given the facts, given the charges, given the burden, I think Mr. Brafman is in a tough spot, and I think his response is to burden-shift.

I think he said repeatedly in the last 15 minutes or so that the Government hasn't come forward with medical experts, the Government hasn't come forward with analyses of the defendant.

The Government does not have that burden. The Government came forward, as the Government does in every other case, with the charges, and with a description, and a description of how those charges fit with the criteria

of the Bail Reform Act.

The Government had no burden to evaluate the defendant, to hire, six -- five therapists to evaluate Mr. Walden before today's proceeding. That's number one, Your Honor.

Number two, as to the point about the reports relying on self-reported information by the defendant, the Government's only observations there is that the submissions from the defendant are naturally limited. I think several of the medical professionals say that in their own submissions, that I am writing this report to the Court, Your Honor. I am a clinician. My submission is limited by what -- by my role and by the information known to me.

I'd like to point Your Honor to Dr. Fagin's submission, which is Exhibit C at page 11.

THE COURT: Wait, wait. Hold on. Exhibit C, at page 11.

Is that a twenty-page document? Yes?

MR. SANDLAR: That's the twenty-page document.

I'm on page 11, under the heading called, "Consumption versus Solicitation as an Additional Factor of Risk Reduction."

THE COURT: Yes. I had that page marked, too. I don't remember why I marked it.

Go ahead.

MR. SANDLAR: I'll just read one or two sentences to illustrate my point about self-reporting.

Dr. Fagin writes, in addition to the research regarding the low base rate of future hands-on offenses on the part of individuals who had online only offenses, there is an additional mitigating factor in Mr. Walden's profile. Namely, by all accounts, Mr. Walden did not enter chat rooms/forums to convince minors to engage in sexual activity, did not groom potential victims, nor did he personally create content.

At the end of that paragraph, there's one more sentence: Those that consume preexisting content are far less risky than those that are seeking out, grooming, and manipulating minors to engage in illegal activity, end quote.

We now know that the defendant did enter chat rooms, as alleged by the Government, of course.

THE COURT: Hang on, hang on. Here's the problem -- and I remember why I marked this page and then I didn't highlight anything.

The next sentence, which confuses me, but I don't know the answer. You know the answer. It says, rather, by allegation, he did engage underaged individuals who had preexisting content and/or offering their services

for new content.

Now, if I understand what that sentence means -- and I'm not sure a hundred percent I do -- but it seems to suggest that the victims had already put out, had published some sort of sexual content. Is that the case? I don't know the evidence.

MR. SANDLAR: That seems like what the doctor is saying, yes.

THE COURT: Is that a fact?

MR. SANDLAR: The Government's point is that if that was the totality of the defendant's conduct, just purchasing preexisting pre-produced materials, child sexual abuse materials, the Government would not have charged production.

THE COURT: No, no, no, no, no, no. It says, he engaged underaged individuals who had preexisting content. Was that -- that's not what you're representing the facts to be here, right?

MR. SANDLAR: That's correct, Your Honor. That's not what the Government's representing the facts to be. The Government is representing the facts to be as follows: The defendant engaging multiple minors in the creation of new child pornography, which is the content charged in Count One and Count Two, the production counts.

So to the degree that Dr. Fagin says, well,

look, the defendant is not a danger because he merely purchased pre-produced materials, that's the intention with the actual charges that the defendant faces.

THE COURT: Okay. Again, I don't think you're reading the report fairly. I think the report suggests that to the extent he did engage minors and pay them for material, it was either preexisting material or it was minors who had offered him the opportunity to buy the materials. I think that's what that says.

MR. SANDLAR: That could be.

THE COURT: Right. And you haven't described the facts enough for me to know whether or not that's true.

MR. SANDLAR: The defendant, over the course of years, used social media to find minors, to chat with the minors, and to solicit the production of new child sexual abuse material. In some cases, the defendant received pre-produced material, which is not charged.

THE COURT: Right. Of the 11 victims -- let me be very, very plain -- of the 11 minor female victims you refer to, is it true that all of them either had previously-produced materials without the defendant's involvement or approached him and offered stuff?

MR. SANDLAR: That's not true.

THE COURT: That's not the case?

MR. SANDLAR: I would say that that's not the case, Your Honor. The defendant approached the minors to solicit materials. In some cases, he was unsuccessful, which answers Your Honor's earlier question of why that's not charged in the Indictment.

THE COURT: Okay.

MR. SANDLAR: In some cases, he was successful. In some cases, the Government could probably supersede with an attempt count, which the Government has not done to date.

But the conduct is serious, for lack of a better word, and my only point in getting up is to say that to the extent that these medical professionals are describing the defendant's conduct, they're only describing -- I believe a couple of them are only describing the complaint earlier. They were reacting to the mere possession count from July, and they certainly don't have a full grasp of the conduct in the manner that's available to the Government and hopefully will soon be available to the defendants after discovery is initiated. That's one point, Your Honor.

If I may, just two --

THE COURT: Yes. Sure. I have another question for you, but go ahead -- after. But go ahead.

MR. SANDLAR: Sure.

The other -- you asked Mr. Brafman a good question, which is much of Mr. Brafman's presentation is about Mr. Walden's condition, his treatment, and his therapy, and why MDC is not an appropriate place for that therapy.

A couple of quick thoughts about -- number one, certainly, many of defendants in criminal cases before Your Honor are dis-regulated in some way, which causes them to engage in criminal conduct. That is not substantial factor that we consider under the Bail Reform Act.

Your Honor asked Mr. Brafman, to the extent that this is relevant, why is this relevant? What does it go to for this bail hearing? This is not sentencing. This is a bail hearing.

And Mr. Brafman said, well, he's continuing his course of treatment, which is minimizing or controlling his urges. Your Honor then read a snippet from one of the submissions that said that that progress is halting.

The Government's other observation is that the offense conduct as described in the detention memo took place from 2020 to 2024, just last year, when the defendant was encountered at JFK and later arrested.

It appears from the defendant's submission that during those years, the defendant was seen by many

therapists, some of whom who write letters to Your Honor. That therapy did not appear to have prevented the defendant from engaging in the alleged charged conduct.

The presence of two or three dozen supportive people in this room did not appear to have prevented the defendant from engaging in that conduct. The presence of Rabbi Bender did not appear to have prevented the defendant from engaging in that conduct.

And so what is paramount now is the issue of safety of the community, and the Government has serious hesitations about -- despite Pretrial's very thorough effort to monitor the defendant through cyber monitoring, the ability to prevent Mr. Walden, who clearly has a compulsion in an issue that's described in the materials from acting on those compulsions, as much as he has in connection with the violation that Your Honor described.

There are other phones in the house. There's access to visitors to the house. Mr. Walden has a wife who presumably has her own phone. And although he's only permitted to use one mobile device that's cyber monitored and one laptop computer that's monitoring by Pretrial Services, as Your Honor yourself described in the *Blackman* case, the ubiquity of electronic devices out there in the world and now in general and specifically in a large household permits the defendant to use another phone.

So although Mr. Brafman pounds the desk and says there have been no other violations, we know there's been a violation that's on the record. There's also a risk of additional violations.

And I really do hope that we don't have to come back to Your Honor for additional violations because I think there is a risk of them.

THE COURT: Okay.

MR. BRAFMAN: Your Honor --

THE COURT: I will let you speak. I just want to clarify a few other things.

I do want to clarify, we don't have a formal report of additional violations from Pretrial at this point, correct?

MR. SANDLAR: We have the report from --

THE COURT: In addition to the September report, there haven't been problems that have been detected since? That's not the end of the inquiry, but that's just a question.

MR. SANDLAR: That's correct.

THE COURT: Counsel, you're sitting next to the Pretrial Services officer. I didn't ask her. I could ask her, but I don't want to put it on the record right now. I just want to clarify. I don't have to think about that.

There is something odd in the September report,

and given the history of this, I mean, this case has appeared before Judge -- then-Magistrate Judge Bulsara, now fortunately for all of us, District Judge Bulsara -- and then two other magistrate judges who each altered the conditions. So it's a little complicated. It's the first time I have thought about this case. Right?

There was some discussion in the September report about getting additional information from his employer, which I think is a company he owns. I'm not sure. It doesn't matter. And then, that there was a refusal to provide information, so they could whitelist devices, whatever that means.

Is that still an issue or is he not teleworking such that it's not an issue or is it something else that I don't understand?

MR. SANDLAR: As I understand it -- and you're right. Pretrial Officer Sarnelli is sitting right next to me, so I would cede to her in one second.

As I understand, this was an issue for discussion and possible resolution to permit the defendant to go to work subject to cyber monitoring at work.

Probation -- excuse me, Pretrial Services, as I understand, was not able to reach a resolution with Mr. Walden's partner in the business that would permit Pretrial Services to have sufficient information about the

business's general cyber monitoring, as it tried to assess whether to request additional cyber monitoring in the workplace.

And in the absence of a resolution, I understand Mr. Walden decided to stay teleworking from home detention, and as far as the Government knows, there's been no resolution of that issue since the discussion back over the summer.

THE COURT: Okay. Do you want to check with the Pretrial Services officer and see if there is anything you should give me on that? And then I'll let Mr. Brafman respond to whatever else he would like to say.

MR. SANDLAR: Your Honor, Pretrial reminded me that at the September 6th violation hearing before Magistrate Judge Marutollo, the judge ordered the defendant to continue working remotely until there's a further order from the Court. And since then, there's been no application to change the conditions.

So as the Government said --

THE COURT: So does that provide the defendant with access to the internet that's unmonitored? I guess that's my question -- or do we just not know? You can tell me we don't know. I think it's fine.

MR. SANDLAR: We just don't know. The defendant has internet that is monitored. The Government's position

consistent with Your Honor's prior ruling in *Blackman*, is that given the ubiquity of devices, the defendant may have access to internet that's unmonitored. That's very easy to imagine.

THE COURT: Okay. And was there ever a recovery of the Jake's iPhone? There was a download of information onto that was detected in those reports. Was that phone recovered, surrendered? Was there any further information about that?

MR. SANDLAR: That phone was seized during the border search.

THE COURT: No, no, no. Nope. Subsequent to the border search, subsequent to the arrest, there is in the Pretrial Services report, I thought. I'll find it. We have to be very precise here. I want to get everything right. I'm not going to decide this based upon incorrect facts.

So August 6th, there is a GPS detection that the defendant made an unauthorized stop at a Verizon Wireless store. Then the defendant accessed Smart Switch to transfer data from Jake's iPhone onto his monitored Android device.

Do we know what Jake's iPhone is? Was it recovered? What does that all mean?

MR. SANDLAR: Your Honor, to the Government's

understanding, based on discussion with Pretrial Officer Sarnelli, the defendant still has -- or the defense counsel still has possession of that iPhone, which is described in the report.

THE COURT: Defense counsel has it?

MR. SANDLAR: Correct.

MR. BIENENFELD: I have it.

THE COURT: You have it? Did you -- I'm confused by that, but you'll explain. Explain, please.

MR. BIENENFELD: So that was the phone that he had when he was arrested.

THE COURT: Okay.

MR. BIENENFELD: It was given over to the officers in Newark. I went with him to Newark to get his belongings. I took the phone with me. I kept the phone with me. Okay?

There was -- in order to get WhatsApp, he needed a code from that phone. I brought the phone to his house. I held the phone the whole time, turned it on, and that's how he got the code in order to get WhatsApp on his phone. That's what they're talking about, downloading from Jake's iPhone.

Bought the phone back with me, and he's never seen the phone since.

THE COURT: So that would have happened around

August 8th?

MR. BIENENFELD: At that time, yeah.

THE COURT: Okay. That's the phone he was arrested with?

MR.BIENENFELD: That's the phone he was arrested with.

THE COURT: So when you're asking for discovery, the Government hasn't given you anything, you actually have the phone?

MR. BIENENFELD: That's not the phone that they seized when he was going in April to Italy. That's the phone I need. I mean, I don't need it. I need to know the information that's on that phone.

THE COURT: Does anybody remember landline telephones? Life was so easy, much easier, right? You had a phone, you're home. If not, you're out. Okay. Got it. Pay phones. I remember pay phones.

MR. BIENENFELD: My finger hurt when I hit the zero button.

THE COURT: Good guy. Thank you. Counsel, that helped a lot. Thank you. Thank you. Good. Got it.

So other than sort of the risk that always applies that I identified in the *Blackman* case, we don't have any specific problem here that I need to know about. Fair?

MR. SANDLAR: That's fair, Your Honor.

THE COURT: Thank you, counsel.

All right. Mr. Brafman, you wanted to say a few things?

MR. BRAFMAN: Judge, I just want to refer again to the paragraph that Your Honor read, which the Government I think dismisses.

They -- it's on page 11 of Dr. Fagin's report, where you started -- where the Government started reading, in addition to the research regarding the low base rate of future hands-on -- it's on page 11, Judge.

THE COURT: Yes.

MR. BRAFMAN: Okay. They continue to say, Mr. Walden did not enter chat rooms, forums to convince minors to engage in sexual activity. He did not groom potential victims, nor did he personally create content, rather, by allegation, he did engage underage individuals who had preexisting content and are offering their services for new content.

So that is the minor that they're talking about in this case. We're talking about someone who is online advertising that they are offering sex for money, and I don't think it resolves the question, but I think it also indicates that these were not minors that he groomed or enticed to engage in sexual activity.

And to answer your last question, Judge, we are prepared to accept any additional orders that the Court imposes concerning future electronic use of any kind, and I think that will solve the Court's concern, and if Pretrial Services continues to do its hands-on monitoring, to the extent that he violates the Court's order in any fashion, we will be back here and surrender the defendant.

But, right now, Judge, I don't think the Government has satisfied their burden of persuading Your Honor that he poses a danger to the community, and they have, I think, not formally conceded the issue of flight, but I think, in light of Your Honor's remarks, I don't think I need to further address that issue.

So we will accept any increase in the monetary phase of what you think is appropriate to ensure the defendant's appearance, and recognizing that the house that we're talking about is the house that his wife and five children currently live in, and she's present in court and prepared to sign that bond as well.

I also indicate that the defendant, as Your Honor noted, is someone of means, but fleeing would under -- resolve all those issues in a negative fashion to the defendant.

THE COURT: Understood.

Mr. Brafman, don't you think or do you believe

that the prosecutor's answer to me that in certain instances with the 11 alleged minor victims, that your client was unsuccessful in obtaining the pictures or the videos or whatever he was trying to create.

Doesn't that undermine -- doesn't that speak to that paragraph on page 11? In other words, it looks like he was soliciting it because they said no sometimes, right?

MR. BRAFMAN: But I think the answer, Judge, is that was before engaging in the kind of treatment he's getting now, which is hands-on by a number of well-respected medical individuals who have also taken him off of a series of medications that they thought were -- that they believed to be counterproductive.

And all of them concede that. All of these medical professionals concede that the medications he was prescribed for a number of years was inconsistent with the kind of treatment he needed, and actually increased his sexual desire or activity.

THE COURT: Okay. Unless there is anything else, I'm going to take a brief break to look at this. Anybody have anything else they would like to add?

MR. BRAFMAN: Not at this time, Judge.

MR. SANDLAR: Nothing further, Your Honor.

THE COURT: All right. I'll step out. I'll be

right back. Thank you.

MR. BRAFMAN: Do you want us to wait, Judge?

THE COURT: Yes, please.

(Recess.)

THE COURT: Everyone, take your seats.

Anything else either counsel wants to add before we resolve this?

MR. BRAFMAN: No, Your Honor.

MR. SANDLAR: No, Your Honor.

MR. BIENENFELD: Yes, Your Honor.

THE COURT: Counsel?

MR.BIENENFELD: We would offer that the entire house be monitored, every single device in the house be monitored, if that's what Pretrial Services -- and no outside devices allowed in the house.

THE COURT: Okay. So your suggestion is we could tighten --

MR. BIENENFELD: They were concerned about the wife's phone, the children's phone. We'll monitor everything and no one could bring a device into the house.

THE COURT: Okay. Thank you. That's helpful, counsel.

So anything further?

MR. SANDLAR: Your Honor, just -- Probation -- excuse me, Pretrial Services officer reminds me that

Pretrial Services doesn't monitor devices of third parties. It's not within their purview.

THE COURT: You need the mic and you've got to speak up.

MR. SANDLAR: Yep.

The Pretrial Services officer reminds me that Pretrial Services does not monitor the devices of third parties, so that the defendant's counsel proposition to the Court --

THE COURT: They could agree to that. I'm not sure. I'm not sure how much it matters here, but thank you.

All right. Anyway, so before the Court is the Government's application for detention in this case. This is a very hard, difficult matter. I spent a lot of time on it.

So let me just kind of take us back to first the principles. So I will refer mainly for its procedural content and the standard of review the *Blackman* decision, which counsel referred to earlier, which is a case I wrote in -- which is found at 22 Westlaw 847375. It's a 2022 case. It's not precedential because it's mine, but I have a lot of authority here, which I'll incorporate by reference, just so we don't have to go through the standard.

But we're confronted with an application under the Bail Reform Act to determine whether or not the defendant should be detained pending trial.

Now, the Bail Reform Act concerns itself principally -- there are two factors that really matter: One is the risk of flight, which as I expressed earlier is something we can deal with; and then there is the danger to the community, which I'll deal with second.

So on the risk of flight, certainly, this case has been before the court several times, not before this judge, before other judges, but I believe this is the first time that it's been before the Court in the procedural posture it is now, which is there's an Indictment and the Indictment involves not only the passive possession or receipt of child pornography, but its production.

That changes things from a legal perspective by significantly increasing the mandatory minimum sentence should there be a conviction, which in turn would increase the incentive to flee.

Counsel's offered, I believe, to increase the bond to a million dollars, which would essentially be the value of the home.

This defendant has a substantial financial footprint, I'll call it; however, I am confident that if

we spent time, we could figure out how to ameliorate that risk. I am not principally concerned with the flight risk. I'm not sure that the bond offered is sufficient, but I'm sure we could increase it or do other things to work that out.

The significant problem, the 800-pound gorilla here is the danger to the community. The Government is correct that this is a presumption case. Let's talk for a moment about what that means.

I don't think this case ultimately turns on the burden of proof, but since counsel argued it, this Court -- and I'm citing from *Blackman* here, but there were other cases in support of this, the Court must determine whether the Government has demonstrated by clear and convincing evidence that no condition or combination of conditions will reasonable assure the safety of any other person in the community.

Now, the child pornography statutes, the child abuse statutes give rise to a statutory presumption that there are no such conditions. That would be 18 USC 3142(e)(3)(B). Of course, that's a limited burden. That provision creates only a limited burden of production to rebut the presumption of detention. And we'll talk about how defendant has gone about in an effort to rebut that presumption.

To determine whether the presumption of dangerousness and flight are rebutted, the district court has to consider the nature and circumstances of the crime charged, the weight of the evidence against the defendant, the history and characteristics of the defendant, including the family ties, employment, community ties, past conduct, and the nature and seriousness of the danger to the community or to an individual.

So if we look at that list, the nature and circumstances of the crime charged are among the most serious. They are incredibly serious.

The weight of the evidence, the Government hasn't provided a great deal of evidence, though these matters can be determined by proffer, and I will hold the Government to its proffer, which is done by -- largely done by letter, and I've read part of this, but I'll just put this on the record.

The Government's letter provides as follows: During the investigation, law enforcement also identified at least 11 minor female victims, ages 14 to 17 years old, whom Walden contacted, paid, and enticed or attempted to entice to produce CSAM via social media from at least 2020 to 2024.

Offense conduct involving two of these victims, Jane Doe Number One and Jane Number Two -- Jane Doe Number

Two, is charged in two -- in the two sexual exploitation of children counts in the Indictment.

Jane Doe One, who was 17 years old at the time that Walden enticed her, produced approximately 11 CSAM videos and 4 CSAM images for Walden. Jane Doe Number Two, who was 16 years old at the time, produced approximately three CSAM videos and four CSAM images for Walden.

In his chat conversations with these victims, Walden insisted that he be addressed as "daddy," and provided directions for what content the minors were to produce, for example, take off your top -- and paid the money via electronic payment after he received the requested content. And then they confirm that the minors were, in fact, minors at that time. So there is significant evidence here.

Then we go on to the history and characteristic of the defendant, including the family ties, employment, community ties, and past conduct.

Now, that's something of a puzzle. The history and characteristics of this defendant, including the incredible outpouring of community support --

And sir, you should be grateful for the community support that you have because most people sit in that chair alone -- particularly in this kind of case -- alone, by themselves. I'm here every day. Believe me,

those benches are rarely this full -- or full at all.

But those things, his business background, his family background, all tend to suggest -- weigh in his favor, but when we talk about his past conduct, that's where it gets problematic.

After being arrested for the possession of child pornography, after that arrest by federal agents around -- I believe it was around August 1st or late July of last year -- on August 6th, 2024, a GPS data indicated -- and I'm reading now from the Pretrial Services report -- GPS data indicated defendant made an unauthorized stop at a Verizon Wireless store -- particularly problematic location. I'm adding that.

Located in Lawrence, between 6:26 and 6:39. Although the defendant denied entering the store, Pretrial Services cannot reasonably assure the Court that he did not enter the store and obtain an unauthorized device.

This is where it gets more problematic: Furthermore, cyber monitoring software also revealed on August 16th, 2024, between 5:45 p.m. and 7:24 p.m., the defendant engaged in a conversation regarding sexual acts in the exchange for money with an unknown female named Braka Bebe, B-E-B-E -- or Bebe, I guess that is.

According to the data, the defendant discusses inviting unknown females over to his residence, stating

that he is on house arrest. In response, Braka Bebe states, should I not be typing this only -- and she uses an abbreviation that means voice notes. This was the last message that was typed, and further communication between this person and the defendant was done through voice notes or one-word messages.

At 7:24, the defendant appears to receive a voice note from another unknown female, Chaya Sarah. Several voice notes are then sent between the defendant and the second unknown female.

At 9:48, the defendant sends this unknown female his home address. At 10:32 p.m., a message is sent from Chaya Sarah, indicating that she is at the defendant's residence.

Defendant appears to bypass cyber monitoring by deleting messages and communicating through voice notes, which cannot be played on the cyber monitoring software.

So that extraordinarily troubling behavior following federal arrest raises significant questions about how to weigh the factor involving this defendant's past conduct.

So we get to the last factor, which is the nature and seriousness of the danger to the community or to any individual.

In *Blackman*, I spent a lot of time addressing

this issue. There is -- the cases are legion concerning the possession, purchase and exchange of child pornographic images and the horrendous impact that has.

And you can see for example, the U. S. Supreme Court's words in the *United States v. Williams*, 553 U. S. 285, where the court says, child pornography harms and debases the most defenseless of our citizens.

But I went on about *Blackman* to say something that's equally true in this case, the case offers something even more troubling: Evidence supporting a strong inference that the defendant engaged in the production of this material through predatory conduct, using social media.

In that case, I noted -- and I think the same is true here -- there is reason to believe that he employed web-based communications to convince children to engage in and electronically record and transmit images of sexual activity. This aspect of the case significantly increases the risk of danger, as the defendant, afforded access to increasingly ubiquitous technologies, could continue such conduct with devastating results. Here, the proposed safeguards prove too insubstantial as measured against the potentially catastrophic risks. That was my determination in *Blackman*.

Now, counsel here has gone above and beyond in

an effort to rebut the presumption and/or make a demonstration on behalf of the defendant. And that is a substantial number of submissions by his treating doctors and others.

I won't go through this in great detail in an effort to safeguard the defendant's privacy, but I will relate back to that one statement in the conclusion by his therapist. His therapist writes, while the path to sustained success may still present challenges, his progress thus far provides a foundation for optimism as he continues to evolve towards decreased compulsions and improved mental clarity.

The problem with that is, from the perspective of the therapist, that's perfectly acceptable. Patients backslide all the time. But in terms of this Court's obligation to defend and protect the community from serious dangers, we can't take that kind of risk and even his therapist admits that there are risks that he is going to backslide.

Mr. Brafman is quite correct that this Court, in a case called *Colucci*, decried the conditions and attempted to sound an alarm concerning the problems at MDC. That's true. And my understanding -- I don't know -- is that some of those problems have been somewhat improved since that time. I hope that's true. But the

bottom line is that their problems in the system does not give this Court an excuse to abdicate its sometimes unpleasant responsibilities.

The last point defense has raised in great detail is the interference with treatment, and that's a serious problem. I understand that problem; however, I don't think it is a factor that is truly relevant at this point. I do believe that at other stages of the proceeding, that might become highly relevant, but I think for today's purposes, I just can't see that as rebutting the showing that's been made.

So based on that, I am compelled to issue a detention order for the defendant. So I'll be doing that today.

All right. What are we doing in terms of --

Counsel?

MR. BIENENFELD: May I argue something?

THE COURT: You'll need to use the microphone and speak loudly unless you --

MR.BIENENFELD: Would you give me permission to argue one or two points based on your decision?

THE COURT: Counsel, I've heard you out, I think. I don't think I've missed something. If there is something urgent you need to tell me, I'll listen to you.

Go ahead.

MR. BIENENFELD: Well, for example, Dr. Liebowitz is a psychiatrist. He's just medicating him. He's not dealing with, you know, talk therapy as the others are. So I know that you gave a lot of weight to Dr. Liebowitz's report. Dr. Fagin is the one who did the testing.

And in terms of the so-called violation, I do have an affidavit from the woman who actually was texting with him, who says that she is an adult, and that she was in recovery and they were just --

THE COURT: Counsel, I'm not introducing some moral Amish-type approach to this to say, oh, he engaged in some sort of sexual thing. I don't care about that. What I care about is the betrayal of trust. In other words, he was released by this court on pretrial monitoring and he's out there maybe buying a phone, I don't know, but using a phone that's being monitoring with codes, and don't use voice mail, and sneak over here.

Counsel, if being arrested by federal agents didn't send a message home, nothing I'm going to do say is going to deliver the right message. That's my problem.

Anything else?

MR. BIENENFELD: Since then, he's been perfect. And there was no -- you're right. He tried to get away with the system, but since then, he was perfect, Judge.

Perfect.

THE COURT: Honestly, counsel, I deal with gang members, street thugs every day who know enough when they're on bail not to mess around because I always tell them -- I don't know if the magistrate judge said it, if you mess around, you're going to jail. I'm sure some of the magistrates made that clear or you made that clear to your client.

So it's problem, right? It's a compulsion. It's beyond something that this Court can control.

MR.BIENENFELD: I could also tell you that the Verizon incident, I was there. I told him to meet me in the parking lot and we tried to get permission and we didn't, so we left.

THE COURT: Understood. I hear you, but I still have the problem of communicating codes or --

MR.BIENENFELD: But it wasn't for the purpose of having sex.

THE COURT: Wait. Talking to Chaya was not for that purpose? Come to my home? I don't know what it was for then.

MR. BIENENFELD: No, it was not.

THE COURT: I don't know what it for then, but look. You can't try to defeat the system after an incident like this.

I just -- look, I get -- I understand. I hear everything you're saying, and this is a very hard decision. It's a very close decision, but there's nothing else I could do.

So do we have a decision as to what we're doing next in terms of status conference or what are we doing within the case?

Oh, let me add one other thing: Mr. Brafman complained earlier about not seeing the images and not seeing the evidence. I'm going to direct the Government to get that matter resolved forthwith.

MR. SANDLAR: Yes, sir.

THE COURT: Mr. Brafman, if it's not up to the right standard, you know where I work. Nothing's written in stone. You come back here and you say, Judge, this is what they're saying about the images or these are the communications they represented to you, and they're not bad. I'm here.

MR. BRAFMAN: Yes, Your Honor.

THE COURT: Sorry. Counsel, you were saying? Do we have a date or what are we going to do?

MR. SANDLAR: We don't have a date yet. We should schedule a date, Your Honor, sufficiently in the future that the Government may produce the discovery.

We should schedule a date sufficiently in the

future, Your Honor -- I suggest more than 30 days -- to permit the Government to produce the discovery, defense counsel to view the discovery that is CSAM that needs to be scheduled to be viewed at an HSI facility, and separately to review non-CSAM discovery, such as returns from grand jury subpoenas.

THE COURT: I have a feeling counsel is not going to agree.

Am I right?

MR. BIENENFELD: Thirty days is a lot for somebody who's in detention.

THE COURT: I agree.

MR. BIENENFELD: I'm available tomorrow. I mean, I'm available Friday. I mean, I'll make myself available.

THE COURT: Yes. We're going to stay on top of this. I'm not going to let this get dragged out. So we'll do 30 days.

I think -- all right. Let's pick a date first, Karen, please.

COURTROOM DEPUTY: How is Monday, February 24th, at noon?

MR. SANDLAR: Your Honor, I'm starting a trial that day in the Eastern District of New York. I could have someone else sub-in for me.

THE COURT: Have someone else sub-in for you. I'm going to stay on top of this issue.

Counsel, you may have somebody behind you who wants to say something to you.

Okay. Okay. Does that date work for you?

MR.BIENENFELD: February 24th at noon here?

THE COURT: Yes.

MR.BIENENFELD: Yes, Your Honor.

THE COURT: Okay. We're going to come back then.

And I'm going to say, counsel, I want the Government to -- I mean, look at this matter. It's a little bit odd, the procedural -- in other words, one of my questions for you earlier was, why don't you charge this earlier? I don't understand. Why did the Indictment wait so long? I don't need to know that. That's your business.

But since this has been pending, we can readily get the discovery turned over. Counsel is going to make himself available, and let's get the discovery done and figure out where we are.

MR. SANDLAR: Understood, Your Honor.

THE COURT: Because I'll tell you, if you can't work things out, which you might not and I'm not involved in that, we'll have a very short trial date on this and

we'll get this done.

MR. SANDLAR: Understood.

THE COURT: Okay. So I will execute the detention order. A couple other things on that.

Are we agreed -- are we going to waive speedy trial between now and the status conference?

MR. BRAFMAN: Yes, Judge.

MR. SANDLAR: Yes, Your Honor.

THE COURT: Okay. All right.

I'll explain to the defendant -- when you're ready. I'll give you a second.

MR. BIENENFELD: I'm sorry. I didn't hear.

THE COURT: I was going to say to the defendant, we're going to exclude speedy trial. Speedy trial is a guarantee you have for a certain of period of time to get the trial done quickly. It means it's got to be in 70 days or less.

Your counsel's indicated a willingness to waive that period, so they can hopefully work things out for you. So I'm going to waive it for this first time, but if things don't work out, I will schedule a trial very soon. Do you understand?

THE DEFENDANT: I do.

THE COURT: Good. All right.

So do we have any medical matters that I need to

inform the prison about? That would include medication, other things.

MR. BIENENFELD: Yes. He has medication with him.

THE COURT: I don't think he's allowed to bring it with him, but make me a list, tell me what it's for, and tell me what conditions you want him evaluated for forthwith. Yes?

MR. BIENENFELD: Yes.

THE COURT: I should say that I'm going to exclude time given the complexity of producing discovery and the discussions counsel are going to have I believe justifies this relatively short adjournment.

MR.BIENENFELD: Your Honor, I have a letter from Dr. Liebowitz describing what the medication is, and I have his prescription. I could hand it up to the Court.

THE COURT: That would be excellent.

MR.BIENENFELD: You want me to bring it up? You want me to give it to the marshal?

THE COURT: Bring it up.

Can I ask, at a very high level, just a general description, what is the condition that all these medications are for? I've just got to put something in here. Is it anxiety, stress?

MR. BIENENFELD: PTSD, anxiety and depression,

ADHD, and ulcers.

THE COURT: All right. I'm going to send this letter over. To the extent there are other medical records, obviously, those should be provided to the facility, too, in order to facilitate. Yes?

MR.BIENENFELD: Yes, Your Honor.

And in terms of his phylacteries, could we order that he could bring his own phylacteries with him?

THE COURT: Forgive me. I do not know --

MR.BIENENFELD: The fill in, the things that they would wrap in the morning. His religious --

THE COURT: His religious things?

MR.BIENENFELD: His religious things, yeah.

THE COURT: I don't know the answer. I just don't know the answer.

MR. BIENENFELD: Could you make a recommendation that he be allowed to have his religious phylacteries with him?

THE COURT: Okay. I'll ask the marshals to bring it. We'll see what happens. Yes?

It's just cloth?

MR. BIENENFELD: It's leather straps.

THE COURT: I can see there might be issues with that, security issues. I'm not sure. But we'll send it over.

All right. Anything else we need to cover today?

MR. SANDLAR: Very briefly, Your Honor.

The defendant's opposition to the Government's detention memo, Docket Number 34, was filed entirely under seal.

I respectfully request that the Government -- excuse me, the defendant file a redacted version of that on the public docket. There is no reason to seal the entirety of the submission.

MR.BIENENFELD: Except for his name, everything else has to do with his psychological issues, Judge.

THE COURT: Yes. I was going to say, it's all medical records. I don't see how not to -- I was very careful to read -- and the record should reflect I was reading very selected portions of that because it's all confidential.

So yes. No, I'm going to keep that under seal for now.

MR. SANDLAR: Understood, Your Honor. Thank you.

THE COURT: Anything else?

MR. BIENENFELD: No, Your Honor.

MR. SANDLAR: No, Your Honor.

THE COURT: All right. See you soon. Thank

you.

(Proceedings concluded.)

## 1

**10001** [1] - 1:19
**108** [1] - 1:21
**10:32** [1] - 56:12
**11** [15] - 11:20, 23:11, 24:20, 33:16, 33:18, 33:21, 36:19, 36:20, 46:8, 46:11, 48:2, 48:6, 53:20, 54:4
**11201** [1] - 1:17
**11516** [1] - 1:22
**12:00** [1] - 1:7
**14** [3] - 11:21, 23:12, 53:20
**15** [1] - 32:18
**15-year** [1] - 9:4
**16** [1] - 54:6
**16th** [1] - 55:20
**17** [4] - 11:21, 23:12, 53:20, 54:3
**18** [2] - 9:3, 52:20
**1st** [1] - 55:8

## 2

**2** [1] - 14:18
**2020** [4] - 11:24, 12:14, 38:22, 53:22
**2022** [1] - 50:21
**2024** [6] - 11:25, 12:14, 38:22, 53:23, 55:9, 55:20
**2024-521** [1] - 2:2
**2025** [1] - 1:7
**22** [2] - 1:7, 50:21
**225** [1] - 1:16
**2251(a** [1] - 9:4
**24** [1] - 1:3
**24th** [2] - 63:21, 64:6
**256** [1] - 1:19
**285** [1] - 57:6
**2nd** [1] - 1:19

## 3

**30** [2] - 63:1, 63:18
**3142(e)(3)(B)** [1] - 52:21
**3142(g)(3** [1] - 9:12
**34** [1] - 68:5

## 4

**4** [1] - 54:5

## 5

**5** [1] - 4:16
**521(GRB** [1] - 1:3
**553** [1] - 57:5
**5:45** [1] - 55:20
**5th** [1] - 25:7

## 6

**680** [1] - 1:21
**6:26** [1] - 55:14
**6:39** [1] - 55:14
**6th** [3] - 42:14, 43:18, 55:9

## 7

**70** [1] - 65:16
**75** [1] - 18:8
**7:24** [2] - 55:20, 56:7

## 8

**800-pound** [1] - 52:6
**847375** [1] - 50:21
**8th** [1] - 45:1

## 9

**9:48** [1] - 56:11

## A

**abbreviation** [2] - 11:23, 56:3
**abdicate** [1] - 59:2
**abiding** [2] - 18:2, 29:21
**ability** [1] - 39:13
**able** [5] - 14:7, 19:12, 29:23, 41:23
**absence** [2] - 11:10, 42:4
**absent** [2] - 30:21
**absurd** [1] - 15:4
**abuse** [8] - 6:9, 6:20, 10:25, 11:1, 27:7, 35:13, 36:17, 52:19
**abused** [1] - 16:18
**accept** [3] - 23:10, 47:2, 47:14
**acceptable** [1] - 58:14
**access** [7] - 5:20, 25:10, 25:11, 39:18, 42:21, 43:3, 57:19
**accessed** [1] - 43:20
**According** [1] - 55:24
**according** [1] - 23:9
**accountable** [1] - 4:18
**accounts** [1] - 34:8
**Act** [5] - 8:6, 33:1, 38:11, 51:2, 51:4
**acted** [1] - 9:20
**acting** [1] - 39:15
**actively** [2] - 10:17, 23:12
**activities** [1] - 25:9
**activity** [6] - 34:10, 34:15, 46:15, 46:25, 48:19, 57:18
**acts** [1] - 55:21
**actual** [1] - 36:3
**Adam** [1] - 5:12
**add** [3] - 48:22, 49:6, 62:8
**addictions** [1] - 6:22
**adding** [1] - 55:13
**addition** [3] - 34:4, 40:16, 46:10
**Additional** [1] - 33:22
**additional** [7] - 34:7, 40:4, 40:6, 40:13, 41:8, 42:2, 47:2
**address** [6] - 3:11, 10:15, 11:13, 23:25, 47:13, 56:12
**addressed** [2] - 29:20, 54:9
**addresses** [2] - 9:11
**addressing** [1] - 56:25
**ADHD** [1] - 67:1
**adjournment** [1] - 66:13
**administered** [1] - 20:17
**admissibility** [1] - 10:4
**admissible** [1] - 9:25
**admits** [1] - 58:18
**adopting** [1] - 29:3
**adult** [2] - 26:9, 60:9
**advertising** [1] - 46:22
**affect** [1] - 8:15
**affective** [1] - 27:5
**affidavit** [1] - 60:8
**afforded** [1] - 57:19
**afternoon** [2] - 3:16, 3:18
**aged** [1] - 23:12
**agenda** [1] - 3:2
**agents** [2] - 55:7, 60:19
**ages** [2] - 11:21, 53:20
**ago** [1] - 26:11
**agree** [5] - 7:11, 9:5, 50:10, 63:8, 63:12
**agreed** [2] - 27:8, 65:5
**ahead** [8] - 4:12, 4:25, 8:24, 30:25, 34:1, 37:24, 59:25
**aided** [1] - 1:25
**airport** [1] - 15:1
**alarm** [1] - 58:22
**alive** [1] - 20:1
**allegation** [2] - 34:24, 46:17
**alleged** [3] - 34:18, 39:3, 48:2
**allegedly** [1] - 3:23
**allow** [5] - 20:9, 20:21, 21:8, 31:22, 32:4
**allowed** [3] - 49:15, 66:5, 67:17
**allowing** [1] - 30:3
**allows** [1] - 19:15
**almost** [1] - 15:16
**alone** [6] - 24:12, 24:13, 24:18, 26:20, 54:24, 54:25
**altered** [1] - 41:4
**ameliorate** [2] - 22:19, 52:1
**AMERICA** [1] - 1:3
**Amish** [1] - 60:12
**Amish-type** [1] - 60:12
**amount** [2] - 6:8, 22:8
**analyses** [1] - 32:21
**analysis** [1] - 21:11
**AND** [1] - 1:11
**Android** [1] - 43:22
**anonymized** [1] - 6:7
**answer** [8] - 19:23, 34:23, 47:1, 48:1, 48:9, 67:14, 67:15
**answers** [1] - 37:4
**anxiety** [2] - 66:24, 66:25
**anytime** [1] - 13:11
**Anyway** [1] - 50:13
**appear** [3] - 39:2, 39:5, 39:7
**appearance** [2] - 2:3, 47:16
**appeared** [1] - 41:2
**application** [10] - 4:10, 4:25, 5:3, 15:7, 17:16, 32:8, 32:9, 42:18, 50:14, 51:1
**applies** [1] - 45:23
**appreciate** [1] - 31:1
**approach** [1] - 60:12
**approached** [2] - 36:23, 37:2
**appropriate** [3] - 14:21, 38:4, 47:15
**April** [1] - 45:11
**area** [1] - 29:11
**argue** [2] - 59:17, 59:21
**argued** [1] - 52:11
**argument** [1] - 30:19
**arguments** [1] - 14:6
**arises** [1] - 16:17
**arraignment** [2] - 3:3, 3:7
**ARRAIGNMENT** [1] - 1:11
**arrest** [17] - 5:13, 12:15, 14:10, 14:12, 14:13, 15:17, 23:21, 24:5, 25:2, 25:7, 25:12, 25:16, 30:4, 43:13, 55:7, 56:1, 56:19
**arrested** [9] - 5:5, 12:18, 22:24, 38:23, 44:11, 45:4, 45:5, 55:6, 60:19
**articulated** [1] - 27:20
**aspect** [3] - 21:3, 30:13, 57:18
**assess** [2] - 19:8, 42:1
**assessed** [1] - 5:9
**assigned** [1] - 7:24
**ASSOCIATES** [1] - 1:18
**assume** [3] - 3:8, 28:5, 31:23
**assure** [2] - 52:16, 55:16
**attached** [1] - 8:4
**attempt** [2] - 27:13, 37:9
**attempted** [7] - 6:2, 6:3, 11:22, 23:22, 29:15, 53:21, 58:22
**attempts** [1] - 26:8
**ATTORNEY'S** [1] - 1:15
**attorneys** [1] - 3:14
**August** [7] - 25:3, 25:6, 43:18, 45:1, 55:8, 55:9, 55:20
**AUSA** [1] - 24:12
**authority** [1] - 50:23
**available** [8] - 11:13, 25:25, 37:18, 37:19, 63:13, 63:14, 63:15, 64:20
**Avenue** [2] - 1:19, 1:21
**aware** [2] - 12:23, 16:6

## B

**background** [3] - 9:14, 55:2, 55:3
**backslide** [2] - 58:15, 58:19
**bad** [2] - 23:5, 62:18
**baffles** [1] - 24:24

**Bail** [5] - 8:6, 33:1, 38:10, 51:2, 51:4
**bail** [14] - 4:7, 5:12, 6:1, 10:1, 14:17, 15:19, 24:1, 26:6, 30:5, 30:12, 31:12, 38:14, 38:15, 61:4
**base** [2] - 34:5, 46:10
**based** [13] - 7:4, 7:7, 8:13, 14:18, 21:9, 23:17, 24:6, 26:4, 43:16, 44:1, 57:16, 59:12, 59:21
**Bebe** [3] - 55:23, 56:1
**BEBE** [1] - 55:23
**become** [1] - 59:9
**BEFORE** [1] - 1:12
**begging** [1] - 19:25
**behalf** [1] - 58:2
**behavior** [3] - 26:10, 31:6, 56:18
**behind** [1] - 64:3
**belongings** [1] - 44:15
**belongs** [1] - 27:3
**benches** [1] - 55:1
**Bender** [2] - 17:21, 39:7
**BENJAMIN** [1] - 1:20
**Benjamin** [1] - 2:16
**best** [4] - 29:4, 29:25, 31:8, 31:15
**betrayal** [1] - 60:14
**better** [3] - 14:7, 25:4, 37:11
**between** [8] - 10:24, 23:12, 31:25, 55:14, 55:20, 56:4, 56:9, 65:6
**beyond** [2] - 57:25, 61:10
**BIENENFELD** [22] - 1:21, 44:7, 44:10, 44:13, 45:2, 45:10, 45:18, 49:10, 49:18, 59:17, 60:1, 60:23, 61:22, 63:10, 63:13, 65:12, 66:3, 66:9, 66:25, 67:16, 67:22, 68:23
**Bienenfeld** [2] - 2:16, 13:22
**bit** [2] - 22:13, 64:13
**Blackman** [11] - 10:11, 10:13, 11:4, 39:22, 43:1, 45:23, 50:19, 52:12, 56:25, 57:8, 57:24
**blood** [1] - 29:8
**bond** [5] - 14:20, 22:8, 47:19, 51:22, 52:3
**BOND** [1] - 1:11
**BOP** [3] - 18:11, 18:13, 19:6
**border** [2] - 43:11, 43:13
**bottom** [1] - 59:1
**Bought** [1] - 44:23
**BRAFMAN** [28] - 1:18, 1:20, 2:15, 2:22, 2:24, 3:10, 4:5, 13:4, 13:7, 18:21, 22:5, 23:20, 25:15, 25:20, 25:24, 26:14, 28:16, 29:5, 31:1, 40:9, 46:5, 46:13, 48:9, 48:23, 49:2, 49:8, 62:19, 65:7
**Brafman** [19] - 2:16, 2:20, 3:8, 4:3, 13:3, 23:1, 24:9, 28:10, 32:16, 38:1, 38:12, 38:16, 40:1, 42:11, 46:3, 47:25, 58:20, 62:8, 62:13
**Brafman's** [1] - 38:2
**Braka** [2] - 55:23, 56:1
**break** [1] - 48:21
**brief** [2] - 32:13, 48:21
**briefly** [1] - 68:3
**bring** [5] - 49:20, 66:5, 66:18, 67:8, 67:20
**Bring** [1] - 66:20
**broader** [1] - 12:12
**brooklyn** [1] - 1:5
**Brooklyn** [1] - 1:17
**brought** [1] - 44:18
**BROWN** [1] - 1:12
**Bulsara** [3] - 5:8, 41:2, 41:3
**burden** [11] - 6:13, 7:16, 24:14, 32:16, 32:17, 32:22, 33:2, 47:9, 52:11, 52:21, 52:22
**burden-shift** [1] - 32:17
**burden-shifting** [1] - 24:14
**burdens** [1] - 8:10
**Bureau** [2] - 15:23, 19:5
**business** [4] - 24:25, 41:24, 55:2, 64:17
**business's** [1] - 42:1
**button** [1] - 45:19
**buy** [2] - 20:2, 36:8
**buying** [1] - 60:16
**BY** [2] - 1:17, 1:20
**bypass** [1] - 56:15

## C

**Cadman** [1] - 1:16
**calculus** [1] - 23:7
**candid** [1] - 29:14
**cannot** [2] - 55:16, 56:17
**care** [3] - 18:6, 60:13, 60:14
**careful** [2] - 14:11, 68:15
**carefully** [3] - 26:19, 27:23
**carries** [1] - 5:21
**case** [34] - 10:11, 10:15, 19:21, 20:6, 20:25, 21:5, 21:21, 23:17, 24:21, 24:24, 25:16, 31:11, 32:24, 35:5, 36:25, 37:2, 39:23, 41:1, 41:6, 45:23, 46:21, 50:14, 50:20, 50:22, 51:9, 52:8, 52:10, 54:24, 57:9, 57:14, 57:18, 58:21, 62:7
**Case** [1] - 2:1
**cases** [8] - 24:6, 36:17, 37:3, 37:7, 37:8, 38:7, 52:13, 57:1
**catastrophic** [1] - 57:23
**CAUSE** [1] - 1:11
**caused** [3] - 6:24, 29:21, 29:24
**causes** [1] - 38:8
**caution** [1] - 30:11
**CCR** [1] - 1:24
**Cedarhurst** [1] - 1:22
**cede** [1] - 41:18
**Central** [3] - 1:21, 5:17, 10:20
**certain** [3] - 25:10, 48:1, 65:15
**certainly** [8] - 7:2, 10:24, 22:4, 22:6, 28:7, 37:17, 38:7, 51:9
**chair** [1] - 54:24
**challenge** [2] - 13:18, 14:5
**challenges** [2] - 28:21, 58:9
**change** [1] - 42:18
**changed** [1] - 26:6
**changes** [2] - 21:20, 51:17
**characteristic** [1] - 54:16
**characteristics** [3] - 9:12, 53:5, 54:20
**charge** [4] - 5:6, 8:25, 12:9, 64:14
**charged** [19] - 3:19, 5:11, 5:18, 5:19, 8:20, 9:20, 9:21, 11:5, 12:5, 12:7, 12:10, 35:14, 35:24, 36:18, 37:5, 39:3, 53:4, 53:10, 54:1
**charges** [14] - 3:21, 4:1, 5:17, 7:15, 8:12, 8:15, 8:16, 8:17, 9:6, 25:3, 32:15, 32:24, 32:25, 36:3
**chat** [6] - 27:13, 34:9, 34:17, 36:15, 46:14, 54:8
**chats** [3] - 13:24, 25:8, 26:8
**Chaya** [3] - 56:8, 56:13, 61:19
**check** [2] - 8:23, 42:9
**child** [22] - 3:22, 6:4, 6:8, 6:20, 10:18, 10:24, 11:1, 11:23, 16:19, 23:13, 25:2, 27:8, 35:12, 35:23, 36:16, 51:15, 52:18, 55:6, 57:2, 57:6
**children** [9] - 9:3, 14:18, 15:2, 19:19, 23:22, 23:25, 47:18, 54:2, 57:16
**children's** [1] - 49:19
**choice** [1] - 30:3
**circumstances** [2] - 53:3, 53:10
**cites** [1] - 10:12
**citing** [1] - 52:12
**citizen** [2] - 18:3, 29:22
**citizens** [1] - 57:7
**clarify** [3] - 40:11, 40:12, 40:24
**clarity** [2] - 28:24, 58:12
**clear** [4] - 2:20, 52:14, 61:7
**clearly** [2] - 6:12, 39:13
**client** [2] - 48:3, 61:8
**clinician** [1] - 33:12
**close** [3] - 18:8, 29:13, 62:3
**cloth** [1] - 67:21
**code** [3] - 25:10, 44:18, 44:20
**codes** [2] - 60:18, 61:16
**cognizable** [3] - 10:23, 11:3, 11:9
**Colucci** [1] - 58:21
**combination** [1] - 52:15
**comfort** [2] - 30:2, 30:15
**comfortable** [1] - 2:19
**coming** [2] - 17:5, 22:17
**communicating** [2] - 56:16, 61:16
**communication** [1] - 56:4
**communications** [2] - 57:16, 62:17
**community** [27] - 15:8, 15:20, 17:2, 18:7, 19:22, 22:22, 24:4, 26:22, 27:1, 28:2, 29:7, 29:23, 30:10, 31:4, 31:17, 39:10, 47:10, 51:8, 52:7, 52:17, 53:6, 53:8, 54:18, 54:21, 54:23, 56:23, 58:16
**company** [1] - 41:9
**compassion** [1] - 18:9
**compelled** [1] - 59:12
**complained** [1] - 62:9
**complaint** [2] - 12:12, 37:15
**complexity** [1] - 66:11
**complicated** [2] - 8:11, 41:5
**complied** [1] - 13:21
**complying** [1] - 27:13
**compulsion** [4] - 16:17, 16:22, 39:14, 61:9
**compulsions** [3] - 28:23, 39:15, 58:11
**compulsive** [1] - 9:19
**computer** [2] - 32:3, 39:21
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**computerized** [1] - 1:25
**computers** [1] - 25:11
**concede** [2] - 48:15, 48:16
**conceded** [1] - 47:11
**concern** [3] - 15:6, 22:7, 47:4
**concerned** [5] - 17:2, 22:21, 22:22, 49:18, 52:2

**concerning** [4] - 26:13, 47:3, 57:1, 58:22
**concerns** [2] - 9:18, 51:4
**conclude** [1] - 20:9
**concluded** [3] - 31:8, 31:11, 69:2
**concludes** [2] - 27:6, 29:6
**conclusion** [5] - 12:6, 12:8, 28:20, 29:3, 58:7
**condition** [10] - 9:14, 14:12, 21:24, 27:11, 29:24, 31:13, 32:1, 38:3, 52:15, 66:22
**conditioned** [1] - 26:10
**conditions** [21] - 5:12, 5:13, 6:23, 14:14, 15:19, 16:8, 26:6, 26:24, 27:14, 27:16, 27:20, 27:24, 30:17, 31:9, 31:10, 41:5, 42:18, 52:16, 52:20, 58:21, 66:7
**conduct** [23] - 5:25, 12:11, 12:14, 12:17, 12:20, 17:25, 27:6, 35:11, 37:11, 37:14, 37:18, 38:9, 38:21, 39:3, 39:6, 39:8, 53:7, 53:24, 54:18, 55:4, 56:21, 57:12, 57:21
**conference** [2] - 62:6, 65:6
**confident** [1] - 51:25
**confidential** [1] - 68:17
**confined** [1] - 26:15
**confinement** [1] - 27:2
**confirm** [1] - 54:13
**confronted** [1] - 51:1
**confused** [1] - 44:9
**confuses** [1] - 34:22
**connection** [1] - 39:16
**consider** [8] - 8:7, 15:7, 15:18, 16:9, 23:21, 31:16, 38:10, 53:3
**considered** [2] - 10:1, 26:20
**considering** [1] - 26:21
**consistent** [3] - 9:17, 9:22, 43:1
**consume** [1] - 34:13
**Consumption** [1] - 33:22
**contact** [5] - 6:3, 18:5, 23:22, 26:8, 30:17
**contacted** [3] - 6:3, 11:21, 53:21
**content** [13] - 34:11, 34:13, 34:25, 35:1, 35:5, 35:16, 35:23, 46:16, 46:18, 46:19, 50:19, 54:10, 54:13
**continue** [14] - 18:12, 20:21, 21:16, 21:18, 28:2, 28:3, 29:17, 30:4, 31:5, 31:19, 31:20, 42:16, 46:13, 57:20
**continued** [5] - 16:15, 23:16, 27:18, 31:12
**continues** [4] - 28:23, 30:12, 47:5, 58:11
**continuing** [3] - 15:10, 30:9, 38:16
**control** [1] - 61:10
**controlling** [1] - 38:17
**conversation** [1] - 55:21
**conversations** [2] - 17:23, 54:8
**convicted** [2] - 16:2, 16:12
**conviction** [3] - 19:11, 51:19
**convince** [3] - 34:9, 46:14, 57:16
**convincing** [1] - 52:15
**correct** [10] - 3:5, 4:10, 4:11, 10:6, 24:2, 35:19, 40:14, 40:20, 52:8, 58:20
**Correct** [2] - 12:22, 44:6
**Counsel** [12] - 2:3, 2:14, 40:21, 45:20, 49:11, 59:16, 59:22, 60:11, 60:19, 62:20, 64:3, 64:19
**counsel** [16] - 2:8, 32:12, 44:3, 44:5, 46:2, 49:6, 49:22, 50:8, 50:20, 52:11, 57:25, 61:2, 63:3, 63:7, 64:11, 66:12
**counsel's** [1] - 65:18
**Counsel's** [1] - 51:21
**Count** [5] - 6:7, 9:1, 35:24
**count** [4] - 5:6, 12:12, 37:9, 37:16
**counterproductive** [1] - 48:14
**counts** [8] - 4:4, 5:20, 5:22, 6:11, 12:10, 16:12, 35:24, 54:2
**County** [1] - 10:21
**couple** [7] - 9:15, 31:9, 31:23, 32:13, 37:15, 38:6, 65:4
**course** [10] - 5:6, 6:2, 6:21, 9:2, 12:19, 22:12, 34:18, 36:14, 38:17, 52:21
**court** [7] - 18:17, 19:20, 47:19, 51:10, 53:2, 57:6, 60:15
**Court** [46] - 1:24, 8:7, 10:22, 11:9, 14:15, 14:21, 15:7, 15:22, 16:6, 16:11, 17:1, 17:17, 18:9, 18:10, 19:10, 19:12, 19:13, 19:24, 20:6, 20:9, 20:12, 20:21, 21:5, 27:6, 29:12, 30:1, 30:15, 30:19, 30:20, 31:6, 32:1, 33:12, 42:17, 47:2, 50:9, 50:13, 51:12, 52:12, 52:13, 55:16, 58:20, 59:2, 61:10, 66:16
**COURT** [112] - 1:1, 2:8, 2:10, 2:12, 2:14, 2:18, 2:23, 3:1, 3:6, 3:11, 3:18, 4:3, 4:6, 4:12, 4:23, 7:10, 8:1, 8:9, 8:21, 8:24, 10:3, 10:13, 11:14, 12:6, 12:13, 12:19, 12:23, 13:2, 13:5, 18:20, 22:2, 22:6, 24:9, 25:19, 25:21, 26:11, 28:7, 28:17, 30:24, 32:11, 33:17, 33:24, 34:19, 35:9, 35:15, 36:4, 36:11, 36:19, 36:25, 37:6, 37:23, 40:8, 40:10, 40:16, 40:21, 42:9, 42:20, 43:5, 43:12, 44:5, 44:8, 44:12, 44:25, 45:3, 45:7, 45:14, 45:20, 46:2, 46:12, 47:24, 48:20, 48:25, 49:3, 49:5, 49:11, 49:16, 49:21, 50:3, 50:10, 59:18, 59:22, 60:11, 61:2, 61:15, 61:19, 61:23, 62:13, 62:20, 63:7, 63:12, 63:16, 64:1, 64:7, 64:9, 64:23, 65:3, 65:9, 65:13, 65:24, 66:5, 66:10, 66:17, 66:20, 67:2, 67:9, 67:12, 67:14, 67:19, 67:23, 68:13, 68:22, 68:25
**Court's** [6] - 10:16, 11:4, 47:4, 47:6, 57:5, 58:15
**Courthouse** [1] - 1:4
**courtroom** [1] - 17:19
**COURTROOM** [2] - 2:1, 63:21
**courts** [1] - 10:2
**cover** [1] - 68:1
**CR** [1] - 1:3
**create** [3] - 34:11, 46:16, 48:4
**creates** [1] - 52:22
**creation** [3] - 10:17, 23:13, 35:23
**credit** [1] - 26:16
**crime** [3] - 21:3, 53:3, 53:10
**crimes** [1] - 20:11
**CRIMINAL** [1] - 1:11
**criminal** [3] - 18:4, 38:7, 38:9
**Criminal** [1] - 2:1
**criteria** [1] - 32:25
**CSAM** [8] - 11:23, 53:22, 54:4, 54:5, 54:7, 63:3, 63:5
**cured** [1] - 26:19
**current** [1] - 6:23
**cuts** [2] - 7:13, 7:14
**cyber** [9] - 5:14, 39:12, 39:20, 41:21, 42:1, 42:2, 55:19, 56:15, 56:17

## D

**daddy** [1] - 54:9
**danger** [14] - 17:2, 22:22, 23:14, 23:15, 24:4, 28:2, 29:7, 36:1, 47:10, 51:7, 52:7, 53:7, 56:23, 57:19
**dangerous** [1] - 11:8
**dangerousness** [4] - 6:15, 10:9, 11:8, 53:2
**dangers** [1] - 58:17
**data** [4] - 43:21, 55:9, 55:11, 55:24
**date** [9] - 19:20, 37:10, 62:21, 62:22, 62:23, 62:25, 63:19, 64:5, 64:25
**days** [4] - 63:1, 63:10, 63:18, 65:17
**de** [1] - 10:1
**deal** [6] - 17:21, 23:23, 51:7, 51:8, 53:13, 61:2
**dealing** [4] - 22:23, 29:7, 31:23, 60:3
**debases** [1] - 57:7
**decent** [1] - 29:22
**decide** [1] - 43:16
**decided** [1] - 42:5
**decision** [10] - 18:22, 21:1, 21:2, 30:6, 31:24, 50:19, 59:21, 62:3, 62:5
**decisions** [2] - 18:17, 19:1
**decreased** [2] - 28:23, 58:11
**decried** [1] - 58:21
**deems** [1] - 14:21
**deeply** [2] - 17:23, 20:1
**defeat** [1] - 61:24
**defend** [1] - 58:16
**DEFENDANT** [3] - 3:16, 4:2, 65:23
**defendant** [100] - 1:7, 3:12, 5:5, 5:11, 5:13, 5:18, 6:2, 6:8, 6:14, 6:19, 6:24, 7:5, 7:6, 7:7, 7:17, 8:19, 9:13, 9:20, 10:17, 11:5, 11:11, 12:17, 13:10, 13:12, 14:2, 14:10, 14:23, 15:10, 16:1, 17:7, 17:13, 17:15, 17:24, 18:19, 19:4, 19:9, 19:14, 20:10, 20:15, 20:18, 22:9, 24:24, 26:14, 28:1, 29:21, 30:9, 30:16, 30:20, 32:21, 33:3, 33:7, 33:9, 34:17, 35:22, 36:1, 36:3, 36:14, 36:17, 37:2, 38:23, 38:25, 39:3, 39:6, 39:8, 39:12, 39:25, 41:20, 42:16, 42:20, 42:24, 43:2, 43:19, 43:20, 44:2, 47:7, 47:20, 47:23, 51:3, 51:24, 52:24, 53:4, 53:5, 54:17, 54:20, 55:11, 55:15, 55:21, 55:24, 56:5, 56:7, 56:9, 56:11, 57:11, 57:19, 58:2,

59:13, 65:10, 65:13, 68:8
**Defendant** [2] - 1:18, 56:15
**defendant's** [18] - 6:16, 6:20, 9:8, 9:14, 14:25, 17:22, 23:16, 31:17, 35:11, 36:22, 37:14, 38:24, 47:16, 50:8, 56:13, 56:20, 58:6, 68:4
**defendants** [2] - 37:20, 38:7
**defense** [8] - 9:5, 9:21, 10:15, 11:2, 11:7, 44:2, 59:4, 63:2
**Defense** [1] - 44:5
**defense's** [2] - 10:8, 10:19
**defenseless** [1] - 57:7
**defensible** [1] - 21:3
**degree** [2] - 9:10, 35:25
**deleting** [1] - 56:16
**deliver** [1] - 60:21
**demonstrate** [3] - 14:2, 18:9, 20:17
**demonstrated** [2] - 21:16, 52:14
**demonstrates** [1] - 20:12
**demonstration** [1] - 58:2
**denied** [1] - 55:15
**depression** [1] - 66:25
**DEPUTY** [2] - 2:1, 63:21
**describe** [3] - 6:19, 6:21, 6:22
**described** [7] - 6:23, 36:11, 38:21, 39:14, 39:16, 39:22, 44:4
**describing** [4] - 37:13, 37:14, 37:15, 66:15
**description** [3] - 32:24, 32:25, 66:22
**designated** [1] - 19:5
**desire** [1] - 48:19
**desk** [1] - 40:1
**despite** [2] - 28:10, 39:11
**detail** [2] - 58:5, 59:5
**detailed** [1] - 21:11
**detain** [1] - 15:5
**detained** [5] - 6:25, 11:11, 16:2, 20:24, 51:3
**detected** [2] - 40:17, 43:7
**detection** [1] - 43:18
**detention** [27] - 3:4, 4:10, 5:14, 5:24, 6:1, 6:13, 9:18, 14:1, 14:24, 15:7, 17:17, 18:11, 19:10, 20:6, 21:9, 23:7, 24:3, 24:6, 32:10, 38:21, 42:6, 50:14, 52:23, 59:13, 63:11, 65:4, 68:5
**determination** [1] - 57:23
**determine** [3] - 51:2, 52:13, 53:1
**determined** [4] - 5:10, 9:19, 21:17, 53:14
**determines** [1] - 19:13
**deterrent** [1] - 22:10
**detriment** [1] - 6:24
**devastating** [1] - 57:21
**device** [5] - 39:20, 43:22, 49:13, 49:20, 55:17
**devices** [7] - 14:11, 39:23, 41:12, 43:2, 49:15, 50:1, 50:7
**dicker** [1] - 22:8
**die** [1] - 29:9
**difference** [1] - 10:23
**different** [3] - 7:3, 22:23, 24:7
**difficult** [2] - 20:23, 50:15
**direct** [1] - 62:10
**directed** [1] - 19:4
**directions** [1] - 54:10
**directive** [1] - 4:22
**dis** [1] - 38:8
**dis-regulated** [1] - 38:8
**discovery** [11] - 4:17, 13:21, 37:20, 45:7, 62:24, 63:2, 63:3, 63:5, 64:19, 64:20, 66:11
**discusses** [1] - 55:24
**discussion** [9] - 3:3, 16:10, 21:6, 26:1, 28:6, 41:7, 41:20, 42:7, 44:1
**discussions** [2] - 26:2, 66:12
**dismiss** [1] - 13:10
**dismisses** [2] - 13:8, 46:7
**Disorder** [1] - 27:9
**distinction** [1] - 11:2
**District** [2] - 41:3, 63:24
**DISTRICT** [4] - 1:1, 1:1, 1:12, 1:16
**district** [2] - 5:9, 53:2
**Docket** [1] - 68:5
**docket** [1] - 68:9
**doctor** [2] - 15:11, 35:7
**doctors** [5] - 21:22, 29:8, 31:7, 31:19, 58:3
**document** [2] - 33:19, 33:20
**documenting** [1] - 16:15
**Doe** [4] - 53:25, 54:3, 54:5
**dollars** [2] - 14:20, 51:22
**done** [13] - 4:15, 4:16, 17:7, 17:9, 21:7, 29:25, 37:9, 53:15, 53:16, 56:5, 64:20, 65:1, 65:16
**double** [1] - 8:23
**double-check** [1] - 8:23
**down** [1] - 11:14
**download** [1] - 43:6
**downloading** [1] - 44:21
**dozen** [3] - 22:15, 22:16, 39:4
**Dr** [11] - 28:13, 28:14, 29:6, 33:15, 34:4, 35:25, 46:8, 60:1, 60:5, 66:15
**dragged** [1] - 63:17
**draw** [2] - 11:3, 12:6
**drawn** [1] - 12:8
**During** [1] - 53:19
**during** [4] - 11:19, 17:3, 38:25, 43:10

**E**

**easier** [1] - 45:15
**East** [1] - 1:16
**Eastern** [1] - 63:24
**EASTERN** [2] - 1:1, 1:16
**easy** [2] - 43:3, 45:15
**effect** [2] - 30:7, 32:7
**effective** [1] - 27:4
**effort** [5] - 17:24, 39:12, 52:24, 58:1, 58:6
**either** [3] - 36:7, 36:21, 49:6
**electronic** [5] - 13:24, 14:11, 39:23, 47:3, 54:12
**electronically** [1] - 57:17
**eloquent** [1] - 27:22
**emotional** [1] - 17:23
**employed** [1] - 57:15
**employer** [1] - 41:9
**employment** [2] - 53:6, 54:17
**encountered** [1] - 38:23
**encountering** [1] - 27:19
**end** [7] - 16:10, 18:15, 21:6, 28:5, 34:12, 34:15, 40:18
**endorsement** [1] - 29:1
**enforcement** [3] - 11:20, 18:5, 53:19
**engage** [10] - 26:23, 34:9, 34:15, 34:24, 36:6, 38:9, 46:15, 46:17, 46:25, 57:16
**engaged** [6] - 26:8, 35:16, 55:21, 57:11, 60:12
**engaging** [5] - 35:22, 39:3, 39:6, 39:8, 48:10
**ensure** [1] - 47:15
**enter** [4] - 34:9, 34:17, 46:14, 55:17
**entered** [1] - 4:6
**entering** [2] - 4:3, 55:15
**entice** [3] - 6:3, 11:22, 53:22
**enticed** [5] - 6:4, 11:22, 46:25, 53:21, 54:4
**enticing** [1] - 14:4
**entire** [1] - 49:12
**entirely** [1] - 68:5
**entirety** [1] - 68:10
**entitled** [1] - 14:2
**equally** [1] - 57:9
**equation** [1] - 23:17
**err** [1] - 30:10
**ESQ** [3] - 1:17, 1:20, 1:21
**essentially** [4] - 14:3, 14:13, 30:13, 51:22
**evaluate** [3] - 7:6, 33:2, 33:3
**evaluated** [1] - 66:7
**evaluations** [1] - 7:5
**Evidence** [1] - 57:10
**evidence** [12] - 8:14, 12:17, 17:13, 20:8, 35:6, 52:15, 53:4, 53:12, 53:13, 54:15, 62:10
**evolve** [2] - 28:23, 58:11
**exacerbated** [2] - 21:24, 27:10
**exactly** [1] - 8:4
**exam** [2] - 8:1, 8:3
**examined** [1] - 15:23
**example** [4] - 6:19, 54:11, 57:4, 60:1
**Excellent** [1] - 4:23
**excellent** [1] - 66:17
**Except** [1] - 68:11
**except** [1] - 12:9
**exception** [1] - 31:14
**exchange** [3] - 6:5, 55:22, 57:2
**exclude** [3] - 10:3, 65:14, 66:11
**excuse** [5] - 6:1, 41:22, 49:25, 59:2, 68:8
**execute** [1] - 65:3
**Exhibit** [2] - 33:16, 33:17
**exhibit** [1] - 7:23
**Exhibits** [1] - 7:22
**expect** [2] - 15:12, 23:2
**experience** [1] - 25:2
**experts** [4] - 13:18, 29:15, 29:16, 32:20
**explain** [5] - 9:13, 17:24, 29:23, 44:9, 65:10
**Explain** [1] - 44:9
**explained** [1] - 27:24
**explains** [1] - 18:24
**exploitation** [2] - 9:2, 54:1
**express** [1] - 20:12
**expressed** [1] - 51:6
**extensive** [1] - 4:17
**extent** [11] - 4:15, 15:18, 17:1, 26:15, 31:4, 32:6, 36:6, 37:13, 38:12, 47:6, 67:3
**extraordinarily** [1] - 56:18

**F**

**faced** [1] - 20:20
**faces** [1] - 36:3
**facilitate** [1] - 67:5
**facilities** [2] - 15:23,

19:6
**facility** [7] - 18:11, 18:13, 18:24, 19:4, 19:15, 63:4, 67:5
**facing** [1] - 17:16
**fact** [10] - 12:7, 15:18, 16:9, 16:15, 16:18, 19:13, 20:24, 28:10, 35:9, 54:14
**factor** [10] - 9:11, 15:6, 23:16, 23:20, 24:3, 34:7, 38:10, 56:20, 56:22, 59:7
**Factor** [1] - 33:22
**factors** [6] - 8:7, 9:9, 9:11, 19:8, 29:20, 51:5
**facts** [20] - 5:10, 10:10, 10:16, 11:10, 12:2, 12:3, 12:4, 22:23, 23:10, 24:7, 24:19, 25:15, 25:21, 32:15, 35:17, 35:20, 35:21, 36:12, 43:17
**Fagin** [3] - 34:4, 35:25, 60:5
**Fagin's** [3] - 29:6, 33:15, 46:8
**fair** [2] - 32:8, 46:1
**Fair** [1] - 45:25
**fairly** [1] - 36:5
**falls** [1] - 6:13
**familiar** [1] - 18:18
**family** [7] - 17:19, 23:24, 24:25, 32:7, 53:6, 54:17, 55:3
**far** [6] - 11:3, 12:12, 28:22, 34:13, 42:6, 58:10
**fashion** [2] - 47:7, 47:22
**favor** [1] - 55:4
**February** [2] - 63:21, 64:6
**federal** [5] - 25:2, 25:12, 55:7, 56:19, 60:19
**female** [8] - 11:20, 24:20, 36:20, 53:20, 55:22, 56:8, 56:10, 56:11
**females** [2] - 25:8, 55:25
**few** [3] - 7:2, 40:11, 46:3
**fifteen** [1] - 14:3
**fifteen-year** [1] - 14:3
**Fifth** [1] - 1:19
**figure** [2] - 52:1, 64:21
**file** [1] - 68:8
**filed** [2] - 28:10, 68:5
**fill** [1] - 67:10
**films** [1] - 13:23
**finalizing** [1] - 30:1
**financial** [1] - 51:24
**fine** [1] - 42:23
**finger** [1] - 45:18
**finish** [1] - 31:21
**First** [1] - 2:10
**first** [12] - 2:21, 3:13, 4:9, 4:13, 13:7, 22:24, 25:24, 41:5, 50:17, 51:12, 63:19, 65:20
**fit** [1] - 32:25
**five** [13] - 5:21, 6:17, 7:3, 7:22, 8:21, 9:1, 14:18, 19:19, 23:25, 26:11, 29:16, 33:3, 47:18
**five-year** [2] - 5:21, 9:1
**flee** [1] - 51:20
**fleeing** [1] - 47:21
**flight** [14] - 6:15, 10:9, 14:22, 15:4, 17:14, 22:3, 22:6, 22:19, 28:4, 47:11, 51:6, 51:9, 52:2, 53:2
**floor** [1] - 13:5
**Floor** [1] - 1:19
**follow** [1] - 4:22
**following** [4] - 4:18, 5:3, 11:16, 56:19
**follows** [2] - 35:22, 53:18
**footprint** [1] - 51:25
**FOR** [1] - 1:11
**forfeited** [1] - 24:2
**forfeiture** [1] - 30:14
**forgive** [1] - 28:13
**Forgive** [1] - 67:9
**formal** [1] - 40:12
**formally** [2] - 9:3, 47:11
**forth** [4] - 12:21, 23:6, 24:19, 25:1
**forthwith** [2] - 62:11, 66:8
**fortunately** [1] - 41:3
**forums** [1] - 46:14
**forward** [6] - 17:12, 24:15, 24:16, 32:19, 32:20, 32:23
**foundation** [2] - 28:22, 58:10
**four** [1] - 54:7
**Friday** [1] - 63:14
**front** [1] - 17:20
**full** [3] - 37:17, 55:1
**furthered** [1] - 16:22
**Furthermore** [1] - 55:19
**future** [5] - 34:5, 46:11, 47:3, 62:24, 63:1

**G**

**gang** [1] - 61:2
**GARY** [1] - 1:12
**general** [3] - 39:24, 42:1, 66:21
**girls** [1] - 23:11
**given** [9] - 11:10, 32:15, 32:16, 41:1, 43:2, 44:13, 45:8, 66:11
**gorilla** [1] - 52:6
**government** [1] - 18:6
**Government** [58] - 1:15, 4:9, 4:15, 5:23, 6:12, 8:13, 9:17, 9:23, 10:11, 10:14, 11:12, 12:9, 13:8, 13:13, 13:17, 13:21, 13:24, 13:25, 14:24, 15:3, 15:5, 15:18, 17:5, 17:10, 20:7, 23:9, 26:1, 29:14, 30:7, 31:5, 32:19, 32:20, 32:22, 32:23, 33:2, 34:18, 35:13, 35:21, 37:8, 37:9, 37:19, 39:10, 42:6, 42:19, 45:8, 46:7, 46:9, 47:9, 52:7, 52:14, 53:12, 53:15, 62:10, 62:24, 63:2, 64:12, 68:7
**Government's** [14] - 9:17, 11:23, 21:4, 24:10, 32:8, 33:8, 35:10, 35:20, 38:20, 42:25, 43:25, 50:14, 53:18, 68:4
**GPS** [3] - 43:18, 55:9, 55:10
**grand** [2] - 5:17, 63:6
**grasp** [1] - 37:17
**grateful** [1] - 54:22
**gratification** [1] - 16:23
**great** [4] - 23:1, 53:13, 58:5, 59:4
**groom** [2] - 34:10, 46:15
**groomed** [1] - 46:24
**grooming** [1] - 34:14
**guarantee** [1] - 65:15
**guess** [2] - 42:21, 55:23
**guilty** [2] - 4:4, 31:24
**guy** [1] - 45:20

**H**

**halting** [1] - 38:19
**hand** [2] - 13:5, 66:16
**hands** [6] - 10:20, 10:25, 34:5, 46:11, 47:5, 48:11
**hands-on** [6] - 10:20, 10:25, 34:5, 46:11, 47:5, 48:11
**hang** [1] - 34:19
**Hang** [1] - 34:19
**hard** [3] - 30:22, 50:15, 62:2
**harms** [1] - 57:6
**heading** [1] - 33:21
**health** [1] - 29:11
**hear** [6] - 3:24, 6:21, 30:19, 61:15, 62:1, 65:12
**heard** [2] - 4:21, 59:22
**hearing** [6] - 8:8, 14:1, 19:10, 38:14, 38:15, 42:14
**HEARING** [1] - 1:11
**hefty** [1] - 28:10
**held** [2] - 4:17, 44:19
**helped** [2] - 21:23, 45:21
**helpful** [1] - 49:21
**helping** [3] - 17:21, 20:11, 23:23
**hesitations** [1] - 39:11
**high** [2] - 19:7, 66:21
**highlight** [1] - 34:21
**highly** [1] - 59:9
**himself** [3] - 16:18, 20:20, 64:20
**hire** [1] - 33:3
**hired** [1] - 7:6
**history** [6] - 9:12, 21:21, 41:1, 53:5, 54:16, 54:19
**hit** [1] - 45:18
**hold** [1] - 53:14
**Hold** [1] - 33:17
**home** [12] - 5:14, 17:22, 23:24, 26:15, 27:1, 30:14, 42:5, 45:16, 51:23, 56:12, 60:20, 61:20
**Honestly** [1] - 61:2
**Honor** [100] - 2:5, 2:9, 2:15, 2:17, 2:22, 3:5, 3:17, 4:2, 4:11, 4:21, 5:2, 5:4, 6:17, 7:1, 7:15, 7:19, 8:19, 8:23, 9:7, 9:15, 9:24, 10:6, 10:7, 10:10, 11:12, 13:1, 13:7, 14:22, 15:17, 16:3, 16:8, 16:17, 17:6, 17:10, 18:14, 18:18, 18:21, 18:23, 18:25, 19:17, 20:16, 21:14, 23:20, 24:2, 25:15, 26:14, 26:16, 26:21, 27:21, 27:23, 29:5, 30:6, 30:10, 30:15, 30:21, 31:2, 31:11, 31:14, 31:16, 31:21, 33:5, 33:12, 33:15, 35:19, 37:2, 37:21, 38:8, 38:12, 38:18, 39:1, 39:16, 39:22, 40:6, 40:9, 42:13, 43:25, 46:1, 46:6, 47:10, 47:21, 48:24, 49:8, 49:9, 49:10, 49:24, 62:19, 62:23, 63:1, 63:23, 64:8, 64:22, 65:8, 66:14, 67:6, 68:3, 68:20, 68:23, 68:24
**Honor's** [3] - 37:4, 43:1, 47:12
**HONORABLE** [1] - 1:12
**hope** [5] - 28:5, 29:4, 30:1, 40:5, 58:25
**hopefully** [2] - 37:19, 65:19
**horrendous** [1] - 57:3
**horrific** [4] - 16:8, 18:16, 27:20, 31:10
**house** [16] - 14:10, 14:12, 14:17, 24:1, 30:4, 32:7, 39:17, 39:18, 44:18, 47:16, 47:17, 49:13, 49:15, 49:20, 56:1
**household** [1] - 39:25
**houses** [1] - 23:24
**HSI** [1] - 63:4
**humiliated** [1] - 19:22
**hundred** [1] - 35:3
**hurt** [1] - 45:18

**I**

**identifiable** [1] - 5:23
**identified** [8] - 6:6, 6:12, 11:20, 12:20, 15:24, 23:11, 45:23, 53:19

**illegal** [1] - 34:15
**illustrate** [1] - 34:3
**images** [6] - 54:5, 54:7, 57:3, 57:17, 62:9, 62:16
**imagine** [1] - 43:4
**immediate** [1] - 32:10
**immediately** [1] - 30:20
**impact** [2] - 16:21, 57:3
**important** [2] - 11:18, 22:17
**impose** [3] - 14:15, 17:17, 20:6
**imposed** [5] - 15:20, 19:2, 19:3, 26:24, 32:1
**imposes** [4] - 19:24, 26:17, 31:14, 47:3
**improved** [3] - 28:24, 58:12, 58:25
**incapable** [1] - 13:15
**incentive** [1] - 51:20
**incident** [2] - 61:12, 61:25
**inclined** [1] - 20:18
**include** [2] - 5:12, 66:1
**including** [5] - 3:22, 17:20, 53:6, 54:17, 54:20
**inconsistent** [2] - 17:25, 48:17
**incorporate** [1] - 50:23
**incorrect** [1] - 43:16
**increase** [10] - 14:16, 14:20, 22:13, 30:5, 30:13, 31:12, 47:14, 51:19, 51:21, 52:4
**increased** [4] - 16:22, 22:12, 26:7, 48:18
**increases** [1] - 57:18
**increasing** [1] - 51:18
**increasingly** [1] - 57:20
**incredible** [1] - 54:21
**incredibly** [2] - 22:25, 53:11
**indicate** [4] - 13:20, 15:22, 16:17, 47:20
**indicated** [3] - 55:9, 55:11, 65:18
**indicates** [1] - 46:24
**indicating** [1] - 56:13
**indication** [3] - 30:9, 31:13, 31:25
**indications** [2] - 15:9, 16:4
**Indictment** [11] - 3:3, 3:20, 5:4, 5:16, 8:12, 12:5, 37:5, 51:14, 54:2, 64:15
**indictment** [1] - 3:9
**individual** [2] - 53:8, 56:24
**individuals** [5] - 34:6, 34:24, 35:16, 46:17, 48:12
**ineffective** [1] - 13:15
**inference** [1] - 57:11
**inform** [1] - 66:1
**information** [8] - 33:7, 33:13, 41:8, 41:11, 41:25, 43:6, 43:8, 45:13
**initiated** [1] - 37:20
**inquiry** [1] - 40:18
**insisted** [1] - 54:9
**instances** [1] - 48:2
**insubstantial** [1] - 57:22
**intention** [1] - 36:2
**interest** [2] - 11:2, 31:15
**interference** [1] - 59:5
**internet** [8] - 6:4, 6:10, 10:18, 27:13, 32:4, 42:21, 42:25, 43:3
**interrupt** [3] - 16:9, 19:17, 23:5
**interrupted** [1] - 21:13
**interviews** [1] - 13:11
**introducing** [1] - 60:11
**investigation** [3] - 11:19, 12:4, 53:19
**inviting** [1] - 55:25
**involved** [3] - 25:17, 25:23, 64:24
**involvement** [1] - 36:23
**involves** [1] - 51:14
**involving** [2] - 53:24, 56:20
**iPhone** [5] - 43:6, 43:21, 43:23, 44:3, 44:22
**Islip** [2] - 5:17, 10:20
**ISRAEL** [1] - 1:6
**issue** [13] - 23:25, 28:8, 39:9, 39:14, 41:13, 41:14, 41:19, 42:7, 47:11, 47:13, 57:1, 59:12, 64:2
**issues** [9] - 17:22, 20:20, 21:23, 23:23, 28:18, 47:22, 67:23, 67:24, 68:12
**Italy** [2] - 15:1, 45:11
**itself** [2] - 17:3, 51:4


## J


**Jacob** [1] - 2:2
**JACOB** [1] - 1:6
**jail** [1] - 61:6
**Jake's** [4] - 43:6, 43:21, 43:23, 44:21
**Jane** [5] - 53:25, 54:3, 54:5
**january** [1] - 1:7
**JFK** [1] - 38:23
**job** [3] - 13:15, 23:1, 32:2
**judge** [5] - 5:8, 5:9, 42:15, 51:11, 61:5
**JUDGE** [1] - 1:12
**Judge** [27] - 5:8, 11:6, 13:20, 15:14, 16:25, 21:25, 23:4, 24:5, 26:25, 27:15, 31:1, 32:13, 41:2, 41:3, 42:15, 46:5, 46:11, 47:1, 47:8, 48:9, 48:23, 49:2, 60:25, 62:15, 65:7, 68:12
**judges** [3] - 19:1, 41:4, 51:11
**July** [2] - 37:17, 55:8
**jury** [2] - 5:17, 63:6
**justice** [1] - 31:15
**justifies** [1] - 66:13


## K


**Karen** [1] - 63:20
**keep** [1] - 68:18
**kept** [1] - 44:15
**kind** [7] - 21:19, 47:3, 48:10, 48:18, 50:17, 54:24, 58:17
**knees** [2] - 20:4, 20:5
**knock** [2] - 25:4, 25:13
**knowing** [3] - 14:23, 15:2, 15:5
**knowledge** [1] - 14:19
**known** [2] - 9:3, 33:14
**knows** [2] - 9:25, 42:6


## L


**lack** [1] - 37:11
**landline** [1] - 45:14
**laptop** [1] - 39:21
**large** [1] - 39:24
**largely** [1] - 53:15
**last** [8] - 25:7, 32:18, 38:22, 47:1, 55:8, 56:3, 56:22, 59:4
**late** [1] - 55:8
**law** [7] - 11:19, 18:1, 18:2, 18:5, 23:17, 29:21, 53:19
**Lawrence** [1] - 55:14
**lawyering** [1] - 30:22
**lawyers** [1] - 20:1
**lead** [1] - 20:23
**least** [9] - 7:23, 11:20, 11:24, 16:4, 20:15, 20:25, 22:15, 53:20, 53:22
**leather** [1] - 67:22
**leave** [1] - 24:1
**leaves** [1] - 15:11
**left** [1] - 61:14
**legal** [1] - 51:17
**legion** [1] - 57:1
**leniency** [1] - 18:9
**Lenny** [2] - 2:5, 2:9
**LEONID** [1] - 1:17
**less** [3] - 26:12, 34:14, 65:17
**letter** [6] - 7:24, 11:16, 53:16, 53:18, 66:14, 67:3
**letters** [2] - 18:8, 39:1
**level** [2] - 19:7, 66:21
**Liebowitz** [4] - 28:13, 28:14, 60:2, 66:15
**Liebowitz's** [1] - 60:5
**life** [3] - 20:20, 20:23, 20:25
**Life** [1] - 45:15
**light** [1] - 47:12
**limited** [4] - 33:9, 33:13, 52:21, 52:22
**line** [1] - 59:1
**Lisa** [1] - 1:24
**list** [2] - 53:9, 66:6
**listen** [1] - 59:24
**live** [3] - 10:25, 14:19, 47:18
**lives** [1] - 14:17
**living** [1] - 23:24
**Located** [1] - 55:14
**location** [1] - 55:13
**lock** [1] - 28:25
**Look** [1] - 30:21
**look** [10] - 14:2, 25:5, 28:13, 29:5, 36:1, 48:21, 53:9, 61:24, 62:1, 64:12
**looking** [2] - 22:25, 23:15
**looks** [2] - 29:2, 48:6
**loose** [3] - 26:25, 30:2, 31:3
**loudly** [1] - 59:19
**low** [3] - 19:7, 34:5, 46:10
**luxury** [1] - 29:3


## M


**magistrate** [4] - 4:16, 5:8, 41:4, 61:5
**Magistrate** [2] - 41:2, 42:15
**magistrates** [1] - 61:7
**mail** [1] - 60:18
**man** [2] - 19:18, 29:22
**mandatory** [5] - 9:1, 9:4, 14:3, 22:13, 51:18
**manifested** [1] - 17:3
**manipulating** [1] - 34:15
**manner** [7] - 6:7, 6:18, 7:8, 9:19, 13:16, 27:19, 37:18
**manufacture** [1] - 3:22
**marked** [3] - 33:24, 33:25, 34:20
**marshal** [1] - 66:19
**marshals** [1] - 67:19
**Marutollo** [1] - 42:15
**material** [9] - 6:9, 10:25, 24:15, 24:16, 36:7, 36:17, 36:18, 57:12
**materials** [14] - 11:1, 14:5, 19:12, 19:13, 21:2, 21:8, 21:21, 35:12, 35:13, 36:2, 36:9, 36:22, 37:3, 39:14
**matter** [5] - 41:10, 50:15, 51:5, 62:11, 64:12
**matters** [3] - 50:11, 53:14, 65:25
**MDC** [13] - 16:5, 18:15, 18:16, 18:19, 19:3, 20:24, 21:17, 27:17, 27:23, 29:18, 31:9, 38:4, 58:23
**mean** [9] - 23:8, 24:18, 29:11, 41:1, 43:24, 45:12, 63:14, 64:12
**means** [9] - 14:13, 22:10, 24:25, 35:2, 41:12, 47:21, 52:9, 56:3, 65:16
**meant** [1] - 21:22
**measured** [1] - 57:22
**media** [4] - 11:24, 36:15, 53:22, 57:13

**medical** [14] - 6:17, 7:3, 7:6, 9:14, 17:12, 29:15, 32:20, 33:10, 37:13, 48:12, 48:16, 65:25, 67:3, 68:14
**medicating** [1] - 60:2
**medication** [3] - 66:1, 66:3, 66:15
**medications** [8] - 21:20, 27:9, 27:12, 27:18, 28:3, 48:13, 48:16, 66:23
**medicine** [1] - 16:20
**medium** [1] - 19:7
**meet** [1] - 61:12
**members** [2] - 17:18, 61:3
**memo** [4] - 6:1, 9:18, 38:21, 68:5
**memorandum** [1] - 16:11
**mental** [3] - 28:24, 29:11, 58:12
**mere** [1] - 37:16
**merely** [3] - 5:11, 5:18, 36:1
**mess** [2] - 61:4, 61:6
**message** [4] - 56:4, 56:12, 60:20, 60:21
**messages** [2] - 56:6, 56:16
**met** [1] - 17:22
**mic** [1] - 50:3
**microphone** [1] - 59:18
**might** [6] - 14:7, 15:3, 17:17, 59:9, 64:24, 67:23
**million** [4] - 14:18, 14:20, 14:21, 51:22
**mind** [1] - 7:24
**mine** [1] - 50:22
**minimizing** [1] - 38:17
**minimum** [6] - 5:21, 8:20, 9:2, 9:4, 14:3, 51:18
**minimums** [1] - 22:13
**minimus** [1] - 10:2
**minor** [7] - 11:20, 24:20, 26:9, 36:20, 46:20, 48:2, 53:20
**minors** [14] - 6:4, 34:9, 34:15, 35:22, 36:6, 36:8, 36:15, 36:16, 37:2, 46:15, 46:24, 54:10, 54:13, 54:14
**minutes** [1] - 32:19
**miracle** [1] - 30:21
**missed** [1] - 59:23
**mitigating** [1] - 34:7
**mobile** [1] - 39:20
**moment** [1] - 52:9
**Monday** [1] - 63:21
**monetary** [4] - 14:16, 30:13, 31:13, 47:14
**money** [3] - 46:22, 54:12, 55:22
**monitor** [4] - 39:12, 49:19, 50:1, 50:7
**monitored** [8] - 26:19, 26:20, 28:1, 39:20, 42:25, 43:21, 49:13, 49:14
**monitoring** [16] - 5:14, 14:11, 27:3, 27:12, 32:3, 39:12, 39:21, 41:21, 42:1, 42:2, 47:5, 55:19, 56:15, 56:17, 60:16, 60:17
**month** [1] - 17:3
**months** [9] - 15:16, 16:25, 21:1, 26:3, 26:9, 26:11, 31:23
**moral** [1] - 60:12
**morning** [3] - 2:5, 2:15, 67:11
**most** [9] - 5:22, 12:10, 12:11, 14:1, 15:14, 20:3, 53:10, 54:23, 57:7
**motivated** [1] - 9:19
**move** [1] - 14:24
**moved** [1] - 26:4
**moves** [1] - 5:24
**moving** [1] - 15:5
**MR** [101] - 2:5, 2:9, 2:11, 2:13, 2:15, 2:22, 2:24, 3:5, 3:10, 4:5, 4:11, 4:21, 5:2, 7:14, 8:3, 8:18, 8:23, 8:25, 10:6, 10:14, 12:3, 12:8, 12:16, 12:22, 13:1, 13:4, 13:7, 18:21, 22:5, 23:20, 25:15, 25:20, 25:24, 26:14, 28:16, 29:5, 31:1, 32:13, 33:20, 34:2, 35:7, 35:10, 35:19, 36:10, 36:14, 36:24, 37:1, 37:7, 37:25, 40:9, 40:15, 40:20, 41:16, 42:13, 42:24, 43:10, 43:25, 44:6, 44:7, 44:10, 44:13, 45:2, 45:10, 45:18, 46:1, 46:5, 46:13, 48:9, 48:23, 48:24, 49:2, 49:8, 49:9, 49:10, 49:18, 49:24, 50:5, 59:17, 60:1, 60:23, 61:22, 62:12, 62:19, 62:22, 63:10, 63:13, 63:23, 64:22, 65:2, 65:7, 65:8, 65:12, 66:3, 66:9, 66:25, 67:16, 67:22, 68:3, 68:20, 68:23, 68:24
**MR.BIENENFELD** [13] - 45:5, 49:12, 59:20, 61:11, 61:17, 64:6, 64:8, 66:14, 66:18, 67:6, 67:10, 67:13, 68:11
**multiple** [3] - 5:20, 6:22, 35:22
**must** [5] - 8:7, 12:9, 19:14, 23:21, 52:13

## N

**name** [2] - 2:8, 68:11
**named** [1] - 55:22
**Namely** [1] - 34:8
**Nassau** [1] - 10:21
**naturally** [1] - 33:9
**nature** [8] - 19:21, 20:11, 20:19, 53:3, 53:7, 53:9, 56:23
**need** [15] - 3:24, 21:16, 23:10, 23:18, 45:12, 45:24, 47:13, 50:3, 59:18, 59:24, 64:16, 65:25, 68:1
**needed** [2] - 44:17, 48:18
**needs** [3] - 31:2, 31:16, 63:3
**negative** [1] - 47:22
**neighborhood** [1] - 14:19
**never** [1] - 44:23
**Never** [1] - 7:24
**NEW** [2] - 1:1, 1:16
**new** [7] - 6:4, 8:12, 10:17, 35:1, 35:23, 36:16, 46:19
**New** [6] - 1:5, 1:17, 1:19, 1:22, 63:24
**Newark** [2] - 44:14
**next** [4] - 34:22, 40:21, 41:17, 62:6
**non** [1] - 63:5
**non-CSAM** [1] - 63:5
**none** [2] - 7:2, 21:12
**noon** [2] - 63:22, 64:6
**north** [1] - 14:18
**note** [4] - 9:15, 18:4, 22:14, 56:8
**noted** [2] - 47:21, 57:14
**notes** [4] - 56:3, 56:5, 56:9, 56:16
**nothing** [2] - 60:20, 62:3
**Nothing** [1] - 48:24
**Nothing's** [1] - 62:14
**notifies** [1] - 15:11
**number** [9] - 3:21, 11:18, 21:7, 21:10, 33:4, 38:6, 48:11, 48:17, 58:3
**Number** [9] - 7:2, 9:16, 32:15, 33:6, 53:25, 54:5, 68:5
**numbers** [1] - 24:22
**numerous** [5] - 5:14, 17:18, 18:6, 18:17, 27:20

## O

**obligation** [2] - 4:19, 58:16
**obligations** [2] - 4:17, 13:22
**observation** [3] - 9:22, 10:16, 38:20
**observations** [2] - 32:14, 33:8
**observed** [3] - 10:2, 10:10, 10:22
**obtain** [1] - 55:17
**obtaining** [1] - 48:3
**obviously** [2] - 7:10, 67:4
**occur** [1] - 12:14
**occurred** [3] - 7:2, 25:16, 27:7
**occurring** [1] - 12:17
**odd** [2] - 40:25, 64:13
**OF** [3] - 1:1, 1:3, 1:16
**offender** [3] - 15:24, 16:1, 16:6
**Offense** [1] - 53:24
**offense** [3] - 5:25, 19:21, 38:21
**offenses** [4] - 3:22, 12:10, 34:5, 34:6
**offer** [1] - 49:12
**offered** [5] - 14:16, 36:8, 36:23, 51:21, 52:3
**offering** [3] - 34:25, 46:18, 46:22
**offers** [1] - 57:9
**OFFICE** [1] - 1:15
**officer** [4] - 40:22, 42:10, 49:25, 50:6
**Officer** [2] - 41:17, 44:1
**officers** [1] - 44:14
**old** [6] - 11:21, 25:9, 30:18, 53:20, 54:3, 54:6
**once** [1] - 28:12
**One** [9] - 6:7, 23:4, 28:16, 28:17, 29:18, 35:24, 51:6, 53:25, 54:3
**one** [25] - 7:2, 8:4, 8:9, 9:16, 14:8, 18:20, 19:25, 28:14, 32:15, 33:4, 34:2, 34:12, 37:20, 38:6, 38:18, 39:20, 39:21, 41:18, 49:20, 56:6, 58:7, 59:21, 60:5, 62:8, 64:13
**one-word** [1] - 56:6
**online** [5] - 6:9, 25:8, 34:6, 46:21
**opined** [1] - 29:16
**opinion** [2] - 11:4, 20:22
**opportunity** [5] - 3:14, 13:18, 13:23, 14:6, 36:8
**opposition** [1] - 68:4
**optimism** [2] - 28:22, 58:10
**order** [10] - 17:16, 20:2, 42:17, 44:17, 44:20, 47:6, 59:13, 65:4, 67:5, 67:7
**ordered** [1] - 42:15
**orders** [2] - 18:11, 47:2
**orthodox** [1] - 18:2
**otherwise** [2] - 18:2, 29:21
**outlined** [1] - 5:25
**outpouring** [1] - 54:21
**outside** [1] - 49:15
**own** [10] - 6:20, 7:7, 13:19, 19:22, 21:11, 27:7, 29:15, 33:11, 39:19, 67:8
**owns** [1] - 41:9

## P

**p.m** [3] - 55:20, 56:12
**package** [1] - 23:1
**page** [10] - 33:16, 33:18, 33:19, 33:20, 33:21, 33:24, 34:20, 46:8, 46:11, 48:6
**paid** [3] - 11:22, 53:21, 54:11

**pair** [1] - 20:2
**pants** [1] - 20:2
**paragraph** [3] - 34:12, 46:6, 48:6
**paramount** [1] - 39:9
**parent** [1] - 29:22
**parking** [1] - 61:13
**part** [6] - 16:13, 16:17, 20:15, 27:7, 34:6, 53:16
**particularly** [2] - 54:24, 55:12
**parties** [2] - 50:2, 50:8
**partner** [1] - 41:24
**passive** [1] - 51:15
**Passover** [1] - 15:1
**past** [5] - 6:21, 53:7, 54:18, 55:4, 56:21
**path** [2] - 28:21, 58:8
**Patients** [1] - 58:14
**Pay** [1] - 45:17
**pay** [2] - 36:6, 45:17
**payment** [2] - 6:5, 54:12
**PC** [1] - 1:18
**penalties** [1] - 8:16
**pending** [2] - 51:3, 64:18
**people** [6] - 17:20, 18:6, 18:8, 22:16, 39:5, 54:23
**percent** [1] - 35:3
**perfect** [2] - 60:23, 60:25
**Perfect** [1] - 61:1
**perfectly** [2] - 29:24, 58:14
**perhaps** [1] - 9:25
**period** [3] - 17:4, 65:15, 65:19
**permission** [2] - 59:20, 61:13
**permit** [3] - 41:20, 41:24, 63:2
**permits** [1] - 39:25
**permitted** [2] - 21:5, 39:20
**person** [5] - 18:2, 20:23, 24:24, 52:17, 56:5
**personally** [2] - 34:11, 46:16
**perspective** [2] - 51:17, 58:13
**persuading** [1] - 47:9
**phase** [1] - 47:15
**phone** [26] - 14:25, 15:3, 39:19, 39:25, 43:7, 43:10, 44:10, 44:15, 44:18, 44:19, 44:20, 44:23, 44:24, 45:3, 45:5, 45:9, 45:10, 45:12, 45:13, 45:16, 49:19, 60:16, 60:17
**phones** [3] - 39:17, 45:17
**phrase** [1] - 12:14
**phylacteries** [3] - 67:7, 67:8, 67:17
**pick** [1] - 63:19
**pictures** [1] - 48:3
**piece** [1] - 3:7
**place** [3] - 21:18, 38:4, 38:22
**plain** [1] - 36:20
**Plaintiff** [1] - 22:9
**plan** [1] - 21:11
**played** [1] - 56:17
**Plaza** [1] - 1:16
**pleads** [1] - 31:24
**pleas** [1] - 4:4
**PM** [1] - 1:7
**point** [15] - 16:3, 26:17, 26:18, 27:2, 31:15, 32:7, 33:6, 33:15, 34:3, 35:10, 37:12, 37:21, 40:14, 59:4, 59:8
**points** [1] - 59:21
**polygraph** [3] - 8:1, 8:3, 9:24
**pornographic** [1] - 57:3
**pornography** [12] - 3:22, 3:23, 6:5, 10:18, 11:24, 23:13, 25:2, 35:23, 51:15, 52:18, 55:7, 57:6
**portion** [2] - 4:7, 14:17
**portions** [1] - 68:16
**pose** [2] - 28:2, 29:6
**poses** [4] - 17:2, 26:21, 31:5, 47:10
**position** [2] - 29:19, 42:25
**possession** [10] - 5:6, 5:11, 5:19, 5:20, 8:20, 37:16, 44:3, 51:15, 55:6, 57:2
**possible** [1] - 41:20
**Post** [1] - 27:9
**Post-traumatic** [1] - 27:9
**posture** [1] - 51:13
**potential** [2] - 34:10, 46:16
**potentially** [1] - 57:23
**pounds** [1] - 40:1
**pre** [3] - 35:12, 36:2, 36:18
**pre-produced** [3] - 35:12, 36:2, 36:18
**precedential** [1] - 50:22
**precise** [1] - 43:15
**predator** [1] - 30:2
**predatory** [1] - 57:12
**preexisting** [6] - 34:13, 34:25, 35:12, 35:16, 36:7, 46:18
**prepare** [1] - 16:13
**prepared** [4] - 14:20, 19:23, 47:2, 47:19
**prescribed** [4] - 21:20, 21:22, 28:4, 48:17
**prescription** [2] - 21:21, 66:16
**presence** [2] - 39:4, 39:6
**present** [5] - 2:17, 19:19, 28:21, 47:18, 58:9
**presentation** [2] - 5:1, 38:2
**presumably** [1] - 39:19
**presumption** [34] - 6:12, 6:14, 6:15, 7:16, 7:17, 7:20, 8:7, 9:6, 10:9, 11:8, 11:10, 14:7, 14:9, 14:14, 17:6, 17:8, 17:11, 20:7, 21:9, 24:6, 24:11, 24:12, 24:13, 24:14, 24:18, 24:21, 30:8, 52:8, 52:19, 52:23, 52:25, 53:1, 58:1
**pretrial** [2] - 11:11, 60:15
**Pretrial** [24] - 2:7, 12:20, 15:11, 25:5, 27:3, 32:2, 39:21, 40:13, 40:22, 41:17, 41:22, 41:25, 42:10, 42:13, 43:14, 44:1, 47:5, 49:14, 49:25, 50:1, 50:6, 50:7, 55:10, 55:15
**Pretrial's** [1] - 39:11
**pretty** [2] - 31:18, 32:2
**prevent** [1] - 39:13
**prevented** [3] - 39:2, 39:5, 39:7
**previously** [2] - 5:5, 36:22
**previously-produced** [1] - 36:22
**principal** [3] - 22:4, 22:7, 28:14
**principally** [2] - 51:5, 52:2
**principles** [2] - 18:1, 50:18
**prison** [2] - 19:3, 66:1
**Prisons** [2] - 15:23, 19:5
**privacy** [1] - 58:6
**privilege** [1] - 2:25
**Probation** [3] - 2:7, 41:22, 49:24
**problem** [11] - 20:19, 26:12, 34:20, 45:24, 52:6, 58:13, 59:6, 60:21, 61:9, 61:16
**problematic** [3] - 55:5, 55:12, 55:18
**problems** [7] - 16:5, 18:16, 18:24, 40:17, 58:22, 58:24, 59:1
**procedural** [3] - 50:18, 51:13, 64:13
**proceed** [1] - 13:25
**proceeding** [3] - 10:1, 33:4, 59:9
**Proceedings** [2] - 1:25, 69:2
**produce** [6] - 6:4, 11:22, 53:22, 54:11, 62:24, 63:2
**produced** [7] - 1:25, 35:12, 36:2, 36:18, 36:22, 54:4, 54:6
**producers** [1] - 6:9
**producing** [2] - 14:4, 66:11
**production** [10] - 5:22, 9:2, 10:24, 11:1, 35:14, 35:24, 36:16, 51:16, 52:22, 57:12
**professional** [1] - 13:16
**professionals** [7] - 6:18, 7:4, 7:6, 21:10, 33:10, 37:13, 48:16
**proffer** [7] - 8:13, 14:1, 17:13, 21:4, 23:10, 53:14, 53:15
**profile** [1] - 34:8
**program** [2] - 4:8, 15:1
**programs** [3] - 15:24, 15:25, 16:7
**progress** [4] - 21:15, 28:22, 38:19, 58:10
**prominence** [1] - 19:21
**prominent** [3] - 15:15, 17:20, 19:25
**proof** [1] - 52:11
**proposed** [1] - 57:21
**proposition** [1] - 50:8
**prosecutor's** [1] - 48:1
**protect** [2] - 15:20, 58:16
**provable** [2] - 12:9, 12:11
**prove** [2] - 12:2, 57:22
**provide** [8] - 13:19, 21:19, 29:13, 29:15, 29:19, 30:23, 41:11, 42:20
**provided** [5] - 16:21, 20:16, 53:13, 54:10, 67:4
**provides** [3] - 28:22, 53:18, 58:10
**providing** [1] - 30:8
**proving** [1] - 27:4
**provision** [1] - 52:22
**psychiatric** [1] - 13:8
**psychiatrist** [2] - 13:11, 60:2
**psychiatrists** [2] - 13:14, 15:15
**psychological** [1] - 68:12
**psychologist** [1] - 13:8
**psychologists** [1] - 13:14
**PTSD** [1] - 66:25
**public** [2] - 3:9, 68:9
**published** [1] - 35:5
**purchase** [1] - 57:2
**purchased** [2] - 6:8, 36:2
**purchasing** [1] - 35:12
**purpose** [2] - 61:17, 61:20
**purposes** [3] - 7:13, 23:11, 59:10
**purview** [1] - 50:2
**put** [5] - 30:13, 35:4, 40:23, 53:17, 66:23
**putting** [1] - 27:1
**puzzle** [1] - 54:19


## Q


**questions** [8] - 10:4, 11:13, 11:15, 19:24, 22:1, 23:3, 56:19, 64:14
**quick** [1] - 38:6
**quickly** [1] - 65:16
**quite** [1] - 58:20
**quote** [1] - 34:16

## R


**rabbi** [1] - 17:20
**Rabbi** [2] - 17:21, 39:7
**raised** [2] - 10:14, 59:4
**raises** [1] - 56:19
**rarely** [1] - 55:1
**rate** [2] - 34:5, 46:10
**rather** [2] - 34:24, 46:17
**reach** [1] - 41:23
**reacting** [1] - 37:16
**read** [16] - 3:20, 4:24, 6:16, 7:1, 7:8, 7:9, 7:10, 11:17, 18:22, 19:1, 28:11, 34:2, 38:18, 46:6, 53:16, 68:15
**readily** [3] - 12:9, 12:11, 64:18
**reading** [5] - 3:9, 36:5, 46:9, 55:10, 68:16
**Reading** [1] - 7:21
**ready** [1] - 65:11
**real** [1] - 24:21
**really** [4] - 30:8, 30:22, 40:5, 51:5
**reason** [3] - 5:23, 57:15, 68:9
**reasonable** [2] - 3:13, 52:16
**reasonably** [1] - 55:16
**reasons** [2] - 11:18, 21:25
**rebut** [13] - 6:14, 7:17, 7:20, 9:10, 10:8, 11:7, 14:7, 14:8, 14:14, 17:8, 52:23, 52:24, 58:1
**rebuttable** [1] - 7:16
**rebutted** [4] - 11:11, 13:17, 14:23, 53:2
**rebutting** [1] - 59:10
**receipt** [3] - 5:21, 8:25, 51:15
**receive** [2] - 7:24, 56:7
**received** [2] - 36:17, 54:12
**receiving** [2] - 19:16, 27:10
**Recess** [1] - 49:4
**recidivist** [1] - 20:18
**recognize** [2] - 20:22, 31:3
**recognized** [2] - 11:9, 29:18
**recognizes** [2] - 20:19, 29:12
**recognizing** [2] - 19:20, 47:16
**recommendation** [1] - 67:16
**recommended** [1] - 18:19
**record** [10] - 2:4, 5:11, 11:17, 18:5, 22:14, 40:3, 40:23, 53:17, 57:17, 68:15
**recorded** [1] - 1:25
**records** [2] - 67:4, 68:14
**recovered** [2] - 43:8, 43:24
**recovery** [2] - 43:5, 60:10
**redacted** [1] - 68:8
**Reduction** [1] - 33:23
**refer** [3] - 36:21, 46:5, 50:18
**reference** [1] - 50:24
**referred** [2] - 25:25, 50:20
**reflect** [1] - 68:15
**Reform** [5] - 8:6, 33:1, 38:10, 51:2, 51:4
**refusal** [1] - 41:11
**regarding** [3] - 34:5, 46:10, 55:21
**regulated** [1] - 38:8
**reject** [1] - 32:9
**relate** [1] - 58:7
**relates** [2] - 8:6, 9:7
**relatively** [2] - 19:18, 66:13
**released** [2] - 27:16, 60:15
**relevant** [4] - 38:13, 59:7, 59:9
**relies** [3] - 13:9, 17:11, 20:7
**religious** [4] - 67:11, 67:12, 67:13, 67:17
**reluctant** [1] - 21:19
**rely** [1] - 13:12
**relying** [7] - 20:14, 21:4, 24:10, 24:11, 24:13, 30:7, 33:7
**remain** [1] - 30:4
**remaining** [1] - 24:17
**remand** [6] - 17:6, 18:14, 19:2, 26:4, 30:11, 30:20
**remanded** [3] - 18:19, 31:14, 32:6
**remarks** [1] - 47:12
**remember** [4] - 33:25, 34:20, 45:14, 45:17
**remind** [2] - 4:14, 4:19
**reminded** [1] - 42:13
**reminds** [2] - 49:25, 50:6
**remorse** [1] - 20:13
**remotely** [1] - 42:16
**repeatedly** [1] - 32:18
**report** [17] - 20:14, 25:5, 29:6, 30:1, 33:11, 36:5, 40:13, 40:15, 40:16, 40:25, 41:8, 43:14, 44:4, 46:8, 55:10, 60:5
**reported** [1] - 33:7
**Reporter** [1] - 1:24
**reporting** [3] - 13:9, 20:13, 34:3
**reports** [11] - 7:4, 7:5, 7:7, 13:9, 13:11, 13:16, 13:17, 13:19, 16:14, 33:6, 43:7
**represented** [1] - 62:17
**representing** [4] - 12:1, 35:17, 35:20, 35:21
**request** [3] - 31:12, 42:2, 68:7
**requested** [1] - 54:13
**require** [1] - 24:3
**required** [2] - 21:7, 24:6
**requirement** [1] - 16:23
**research** [2] - 34:4, 46:10
**resellers** [1] - 6:9
**residence** [2] - 55:25, 56:14
**resolution** [5] - 32:8, 41:20, 41:23, 42:4, 42:7
**resolve** [2] - 47:22, 49:7
**resolved** [1] - 62:11
**resolves** [1] - 46:23
**respect** [4] - 14:8, 15:8, 20:1, 27:25
**respected** [2] - 29:22, 48:12
**respectfully** [11] - 13:20, 14:1, 15:9, 15:14, 17:7, 17:14, 18:4, 18:10, 19:23, 20:9, 68:7
**respond** [1] - 42:12
**response** [4] - 10:19, 32:12, 32:17, 56:1
**responsibilities** [1] - 59:3
**responsible** [1] - 30:5
**restrictions** [1] - 5:15
**results** [2] - 20:16, 57:21
**returned** [2] - 5:16, 15:2
**returns** [3] - 15:12, 63:5
**revealed** [2] - 12:4, 55:19
**review** [2] - 50:19, 63:5
**rights** [2] - 31:17
**ringing** [1] - 28:25
**rise** [1] - 52:19
**Risk** [1] - 33:23
**risk** [22] - 10:9, 14:22, 15:4, 15:8, 17:14, 19:8, 22:3, 22:6, 22:13, 22:19, 23:14, 28:4, 30:14, 40:3, 40:7, 45:22, 51:6, 51:9, 52:2, 52:3, 57:19, 58:17
**risks** [2] - 57:23, 58:18
**risky** [2] - 29:1, 34:14
**RMR** [1] - 1:24
**role** [1] - 33:13
**room** [1] - 39:5
**rooms** [2] - 34:18, 46:14
**rooms/forums** [1] - 34:9
**rough** [1] - 22:15
**row** [1] - 17:21
**Rule** [1] - 4:16
**ruling** [2] - 10:23, 43:1


## S


**safeguard** [1] - 58:6
**safeguards** [1] - 57:22
**safety** [2] - 39:10, 52:16
**SANDLAR** [54] - 2:5, 2:9, 2:11, 2:13, 3:5, 4:11, 4:21, 5:2, 7:14, 8:3, 8:18, 8:23, 8:25, 10:6, 10:14, 12:3, 12:8, 12:16, 12:22, 13:1, 32:13, 33:20, 34:2, 35:7, 35:10, 35:19, 36:10, 36:14, 36:24, 37:1, 37:7, 37:25, 40:15, 40:20, 41:16, 42:13, 42:24, 43:10, 43:25, 44:6, 46:1, 48:24, 49:9, 49:24, 50:5, 62:12, 62:22, 63:23, 64:22, 65:2, 65:8, 68:3, 68:20, 68:24
**Sandlar** [2] - 2:6, 2:9
**SANDLER** [1] - 1:17
**Sarah** [2] - 56:8, 56:13
**Sarnelli** [3] - 2:6, 41:17, 44:2
**satisfied** [2] - 31:6, 47:9
**SAUL** [1] - 1:21
**Saul** [1] - 2:16
**saw** [1] - 5:4
**schedule** [3] - 62:23, 62:25, 65:21
**scheduled** [1] - 63:4
**Schmid** [1] - 1:24
**science** [2] - 29:12, 29:13
**seal** [3] - 68:6, 68:9, 68:18
**search** [2] - 43:11, 43:13
**seat** [1] - 3:1
**seated** [1] - 4:8
**seats** [1] - 49:5
**second** [6] - 8:9, 24:10, 41:18, 51:8, 56:10, 65:11
**security** [2] - 19:7, 67:24
**See** [1] - 68:25
**see** [11] - 15:11, 19:12, 19:13, 21:2, 21:8, 42:10, 57:4, 59:10, 67:20, 67:23, 68:14
**seeing** [2] - 62:9, 62:10
**seeking** [1] - 34:14
**seem** [1] - 16:16
**seized** [3] - 14:25, 43:10, 45:11
**selected** [1] - 68:16
**self** [7] - 7:4, 7:5, 7:7, 13:9, 20:13, 33:7, 34:3
**self-reported** [1] - 33:7
**self-reporting** [3] - 13:9, 20:13, 34:3
**self-reports** [2] - 7:5, 7:7
**send** [3] - 60:20, 67:2, 67:24
**sends** [1] - 56:11
**sense** [1] - 9:9
**sensitive** [1] - 28:18
**sent** [3] - 27:17, 56:9, 56:12
**sentence** [11] - 16:11, 18:7, 19:2, 19:3, 19:15, 26:16, 28:20, 34:13, 34:22, 35:2,

51:18
**sentenced** [3] - 18:13, 19:10, 19:14
**sentences** [1] - 34:3
**sentencing** [4] - 7:9, 7:12, 7:20, 38:14
**separately** [1] - 63:5
**September** [5] - 25:7, 40:16, 40:25, 41:7, 42:14
**series** [1] - 48:13
**serious** [11] - 5:18, 5:25, 9:5, 12:10, 20:12, 37:11, 39:10, 53:11, 58:17, 59:6
**seriously** [2] - 5:22, 27:12
**seriousness** [2] - 53:7, 56:23
**services** [2] - 34:25, 46:19
**Services** [20] - 2:7, 12:20, 15:12, 25:6, 27:3, 32:2, 39:22, 40:22, 41:22, 41:25, 42:10, 43:14, 47:5, 49:14, 49:25, 50:1, 50:6, 50:7, 55:10, 55:16
**set** [3] - 22:23, 23:10, 24:19
**Several** [1] - 56:9
**several** [9] - 15:14, 15:16, 16:18, 19:6, 21:1, 27:8, 31:7, 33:10, 51:10
**sex** [6] - 15:23, 16:1, 16:6, 30:18, 46:22, 61:18
**sexual** [18] - 6:8, 9:2, 10:25, 11:1, 16:23, 25:9, 27:7, 34:10, 35:5, 35:13, 36:16, 46:15, 46:25, 48:19, 54:1, 55:21, 57:17, 60:13
**shelf** [1] - 20:25
**shift** [1] - 32:17
**shifting** [1] - 24:14
**short** [4] - 10:7, 11:6, 64:25, 66:13
**shortly** [1] - 25:16
**showing** [1] - 59:11
**shown** [1] - 8:13
**sick** [1] - 29:9
**side** [1] - 30:10
**sign** [1] - 47:19
**significant** [8] - 8:14, 23:13, 23:14, 24:22, 52:6, 54:15, 56:19
**significantly** [2] - 51:18, 57:18
**similar** [4] - 7:9, 10:10, 10:16, 11:9
**simply** [2] - 15:20, 20:6
**single** [2] - 5:6, 49:13
**single-count** [1] - 5:6
**sit** [1] - 54:23
**sitting** [3] - 11:14, 40:21, 41:17
**Sitting** [1] - 12:16
**six** [8] - 12:12, 15:16, 16:25, 17:3, 26:3, 26:9, 33:3
**six-count** [1] - 12:12
**six-month** [1] - 17:3
**Smart** [1] - 43:20
**sneak** [1] - 60:18
**snippet** [1] - 38:18
**so-called** [1] - 60:7
**social** [4] - 11:24, 36:15, 53:22, 57:13
**software** [2] - 55:19, 56:17
**solicit** [2] - 36:16, 37:3
**Solicitation** [1] - 33:22
**solicited** [1] - 23:12
**soliciting** [2] - 10:17, 48:7
**solve** [1] - 47:4
**someone** [7] - 15:25, 16:24, 19:2, 46:21, 47:21, 63:25, 64:1
**sometimes** [2] - 48:7, 59:2
**somewhat** [3] - 22:19, 58:24
**soon** [3] - 37:19, 65:21, 68:25
**sorry** [4] - 6:20, 22:5, 25:6, 65:12
**Sorry** [1] - 62:20
**sort** [3] - 35:5, 45:22, 60:13
**sound** [1] - 58:22
**sounds** [1] - 7:19
**specific** [3] - 15:25, 22:1, 45:24
**specifically** [1] - 39:24
**specter** [1] - 25:1
**speedy** [2] - 65:5, 65:14
**Speedy** [1] - 65:14
**spend** [1] - 20:3
**spent** [3] - 50:15, 52:1, 56:25
**spot** [1] - 32:16
**stage** [1] - 5:3
**stages** [1] - 59:8
**stand** [1] - 22:2
**standard** [3] - 50:19, 50:25, 62:14
**start** [2] - 3:6, 22:3
**started** [2] - 46:9
**starting** [1] - 63:23
**state** [1] - 2:3
**statement** [2] - 11:17, 58:7
**states** [1] - 56:2
**STATES** [4] - 1:1, 1:3, 1:12, 1:15
**States** [3] - 1:4, 2:6, 57:5
**stating** [1] - 55:25
**status** [2] - 62:6, 65:6
**statute** [1] - 10:24
**statutes** [3] - 11:5, 52:18, 52:19
**statutory** [7] - 5:21, 6:11, 7:15, 8:16, 11:7, 17:6, 52:19
**stay** [3] - 42:5, 63:16, 64:2
**stenography** [1] - 1:25
**step** [1] - 48:25
**still** [7] - 24:17, 28:21, 41:13, 44:2, 44:3, 58:9, 61:15
**stone** [1] - 62:15
**stop** [4] - 8:9, 24:9, 43:19, 55:11
**store** [4] - 43:20, 55:12, 55:15, 55:17
**straps** [1] - 67:22
**street** [1] - 61:3
**Stress** [1] - 27:9
**stress** [2] - 18:10, 66:24
**strict** [2] - 16:24, 26:23
**strong** [1] - 57:11
**stuff** [1] - 36:23
**sub** [2] - 63:25, 64:1
**sub-in** [2] - 63:25, 64:1
**subject** [3] - 14:4, 18:17, 41:21
**submission** [20] - 5:5, 6:13, 6:16, 7:9, 7:12, 7:19, 7:20, 8:6, 9:8, 9:22, 10:8, 10:15, 11:7, 16:13, 28:11, 31:7, 33:12, 33:16, 38:24, 68:10
**submissions** [11] - 7:1, 7:3, 7:21, 7:22, 8:4, 9:13, 9:16, 33:9, 33:11, 38:19, 58:3
**submit** [6] - 15:8, 16:11, 16:14, 17:7, 17:14, 18:7
**submitted** [5] - 7:11, 13:16, 13:17, 21:10, 23:1
**subpoenas** [1] - 63:6
**Subsequent** [1] - 43:12
**subsequent** [1] - 43:13
**subset** [2] - 12:4, 12:7
**substance** [1] - 13:12
**substantial** [6] - 8:14, 22:9, 24:25, 38:10, 51:24, 58:3
**substantive** [1] - 7:22
**success** [2] - 28:21, 58:9
**successful** [1] - 37:7
**successfully** [1] - 6:3
**suffered** [1] - 18:16
**suffice** [1] - 28:11
**sufficient** [3] - 5:12, 41:25, 52:3
**sufficiently** [4] - 26:22, 28:1, 62:23, 62:25
**suggest** [8] - 13:14, 14:8, 15:3, 18:14, 20:10, 35:4, 55:3, 63:1
**suggested** [1] - 21:12
**suggesting** [1] - 27:25
**suggestion** [3] - 17:9, 17:10, 49:16
**suggests** [7] - 13:24, 15:19, 17:13, 19:24, 23:18, 31:4, 36:5
**Suite** [2] - 1:19, 1:21
**suits** [1] - 20:2
**summer** [3] - 5:7, 12:18, 42:8
**supersede** [1] - 37:8
**supervision** [2] - 16:24, 26:7
**support** [8] - 5:12, 6:18, 8:14, 17:19, 22:16, 52:13, 54:21, 54:23
**supporting** [1] - 57:10
**supportive** [2] - 19:20, 39:4
**supposed** [1] - 16:21
**Supreme** [1] - 57:4
**surrender** [2] - 19:4, 47:7
**surrendered** [1] - 43:8
**sustained** [2] - 28:21, 58:9
**Switch** [1] - 43:20
**system** [3] - 59:1, 60:25, 61:24

### T

**table** [1] - 28:5
**Tara** [1] - 2:6
**technologies** [1] - 57:20
**telephones** [1] - 45:15
**teleworking** [2] - 41:13, 42:5
**tend** [1] - 55:3
**tends** [1] - 22:18
**terms** [6] - 24:4, 58:15, 59:15, 60:7, 62:6, 67:7
**test** [2] - 20:16, 29:8
**tested** [1] - 7:4
**testing** [1] - 60:6
**texting** [1] - 60:8
**THE** [115] - 1:12, 2:8, 2:10, 2:12, 2:14, 2:18, 2:23, 3:1, 3:6, 3:11, 3:16, 3:18, 4:2, 4:3, 4:6, 4:12, 4:23, 7:10, 8:1, 8:9, 8:21, 8:24, 10:3, 10:13, 11:14, 12:6, 12:13, 12:19, 12:23, 13:2, 13:5, 18:20, 22:2, 22:6, 24:9, 25:19, 25:21, 26:11, 28:7, 28:17, 30:24, 32:11, 33:17, 33:24, 34:19, 35:9, 35:15, 36:4, 36:11, 36:19, 36:25, 37:6, 37:23, 40:8, 40:10, 40:16, 40:21, 42:9, 42:20, 43:5, 43:12, 44:5, 44:8, 44:12, 44:25, 45:3, 45:7, 45:14, 45:20, 46:2, 46:12, 47:24, 48:20, 48:25, 49:3, 49:5, 49:11, 49:16, 49:21, 50:3, 50:10, 59:18, 59:22, 60:11, 61:2, 61:15, 61:19, 61:23, 62:13, 62:20, 63:7, 63:12, 63:16, 64:1, 64:7, 64:9, 64:23, 65:3, 65:9, 65:13, 65:23, 65:24, 66:5, 66:10, 66:17, 66:20, 67:2, 67:9, 67:12, 67:14, 67:19, 67:23, 68:13, 68:22, 68:25

**themselves** [1] - 54:25
**then-Magistrate** [1] - 41:2
**theory** [1] - 9:17
**therapist** [7] - 20:14, 21:15, 28:14, 58:8, 58:14, 58:18
**therapists** [5] - 16:4, 23:22, 27:8, 33:3, 39:1
**therapy** [16] - 15:10, 16:9, 16:15, 16:16, 18:12, 25:17, 26:3, 27:4, 27:17, 28:3, 31:19, 31:22, 38:4, 38:5, 39:2, 60:3
**therefore** [2] - 7:18, 9:25
**they've** [2] - 21:16, 21:17
**thinking** [1] - 10:13
**third** [3] - 9:11, 50:1, 50:7
**thirties** [1] - 25:17
**Thirty** [1] - 63:10
**thorough** [4] - 18:22, 18:25, 22:25, 39:11
**thoughts** [2] - 7:2, 38:6
**threat** [3] - 26:21, 30:9, 31:5
**three** [3] - 22:16, 39:4, 54:7
**Three** [1] - 9:1
**throughout** [1] - 20:20
**thugs** [1] - 61:3
**ties** [4] - 53:6, 54:17, 54:18
**tighten** [1] - 49:17
**timely** [1] - 27:19
**today** [16] - 3:2, 3:15, 12:16, 14:23, 15:4, 16:14, 17:15, 17:18, 17:19, 18:14, 23:19, 24:3, 24:8, 25:13, 59:14, 68:2
**today's** [4] - 7:13, 23:11, 33:4, 59:10
**tomorrow** [1] - 63:13
**took** [2] - 38:21, 44:15
**top** [3] - 54:11, 63:16, 64:2
**totality** [2] - 10:7, 35:11
**tough** [1] - 32:16
**towards** [2] - 28:23, 58:11
**Transcript** [1] - 1:25
**Transcription** [1] - 1:25
**transfer** [1] - 43:21
**transmit** [1] - 57:17
**traumatic** [1] - 27:9
**treat** [2] - 15:25, 21:23
**treating** [2] - 15:15, 58:3
**treatment** [25] - 6:21, 6:23, 9:15, 15:24, 16:7, 19:15, 19:18, 20:10, 20:21, 21:11, 21:12, 21:18, 23:5, 23:16, 29:11, 29:17, 29:19, 30:4, 31:8, 38:3, 38:17, 48:10, 48:18, 59:5
**trial** [10] - 6:25, 31:25, 51:3, 63:23, 64:25, 65:6, 65:14, 65:16, 65:21
**tried** [4] - 9:8, 42:1, 60:24, 61:13
**tries** [1] - 11:2
**trigger** [1] - 9:6
**troubling** [2] - 56:18, 57:10
**true** [7] - 36:13, 36:21, 36:24, 57:9, 57:15, 58:23, 58:25
**truly** [1] - 59:7
**trust** [1] - 60:14
**try** [5] - 14:9, 17:8, 17:24, 30:22, 61:24
**trying** [3] - 8:10, 27:22, 48:4
**turn** [1] - 51:19
**turned** [3] - 31:3, 44:19, 64:19
**turning** [2] - 26:25, 30:2
**turns** [1] - 52:10
**twenty** [2] - 33:19, 33:20
**twenty-page** [2] - 33:19, 33:20
**Two** [6] - 6:6, 6:7, 35:24, 53:25, 54:1, 54:5
**two** [19] - 5:22, 5:23, 14:20, 16:4, 20:2, 22:15, 23:2, 25:22, 29:18, 33:6, 34:2, 37:22, 39:4, 41:4, 51:5, 53:24, 54:1, 59:21
**type** [1] - 60:12
**typed** [1] - 56:4
**typically** [1] - 6:5
**typing** [1] - 56:2

## U

**ubiquitous** [1] - 57:20
**ubiquity** [2] - 39:23, 43:2
**ulcers** [1] - 67:1
**ultimately** [5] - 7:8, 16:10, 18:13, 21:15, 52:10
**unauthorized** [3] - 43:19, 55:11, 55:17
**under** [14] - 4:16, 9:11, 10:24, 11:5, 14:10, 16:8, 16:24, 31:10, 33:21, 38:10, 47:22, 51:1, 68:5, 68:18
**underage** [1] - 46:17
**underaged** [2] - 34:24, 35:16
**underlying** [1] - 29:20
**undermine** [1] - 48:5
**understood** [1] - 4:22
**Understood** [5] - 47:24, 61:15, 64:22, 65:2, 68:20
**UNITED** [4] - 1:1, 1:3, 1:12, 1:15
**United** [3] - 1:4, 2:6, 57:5
**unknown** [5] - 55:22, 55:25, 56:8, 56:10, 56:11
**unless** [2] - 21:25, 59:19
**Unless** [1] - 48:20
**unmonitored** [2] - 42:21, 43:3
**unpleasant** [1] - 59:3
**unsuccessful** [2] - 37:3, 48:3
**up** [8] - 11:6, 18:15, 37:12, 50:4, 62:13, 66:16, 66:18, 66:20
**urgent** [1] - 59:24
**urges** [1] - 38:18
**USA** [1] - 2:2
**USC** [2] - 9:4, 52:20
**uses** [1] - 56:2

## V

**value** [1] - 51:23
**various** [1] - 8:10
**vast** [1] - 6:8
**Verizon** [3] - 43:19, 55:12, 61:12
**version** [1] - 68:8
**versus** [4] - 2:2, 8:17, 10:25, 33:22
**via** [3] - 11:24, 53:22, 54:12
**victims** [13] - 5:23, 6:6, 11:21, 24:20, 34:10, 35:4, 36:19, 36:20, 46:16, 48:2, 53:20, 53:24, 54:8
**videos** [3] - 48:4, 54:5, 54:7
**view** [3] - 13:23, 14:5, 63:3
**viewed** [2] - 14:5, 63:4
**violated** [2] - 14:12, 32:1
**violates** [1] - 47:6
**violating** [2] - 18:1
**violation** [9] - 9:3, 26:4, 26:5, 30:16, 30:17, 39:16, 40:3, 42:14, 60:7
**violations** [6] - 15:17, 26:23, 40:2, 40:4, 40:6, 40:13
**visitors** [1] - 39:18
**voice** [6] - 56:3, 56:5, 56:8, 56:9, 56:16, 60:18
**voluminous** [5] - 6:16, 6:18, 7:3, 7:19, 10:8
**vowed** [2] - 31:19, 31:20

## W

**Wait** [2] - 33:17, 61:19
**wait** [3] - 33:17, 49:2, 64:16
**waive** [3] - 65:5, 65:18, 65:20
**waiving** [1] - 3:9
**Walden** [19] - 2:2, 2:16, 11:21, 15:15, 16:7, 16:12, 19:18, 21:11, 33:4, 34:8, 39:13, 39:18, 42:5, 46:14, 53:21, 54:4, 54:5, 54:7, 54:9
**WALDEN** [1] - 1:6
**Walden's** [3] - 34:7, 38:3, 41:24
**Walsh** [1] - 5:13
**wants** [2] - 49:6, 64:4
**warehouse** [1] - 16:7
**warehoused** [2] - 31:10, 31:22
**wax** [1] - 27:22
**ways** [2] - 7:12, 9:21
**weaned** [1] - 27:11
**web** [1] - 57:16
**web-based** [1] - 57:16
**weekend** [1] - 6:17
**weigh** [3] - 8:10, 55:3, 56:20
**weight** [4] - 10:1, 53:4, 53:12, 60:4
**Welcome** [2] - 2:12, 2:23
**well-conditioned** [1] - 26:10
**well-respected** [1] - 48:12
**Westlaw** [1] - 50:21
**WhatsApp** [2] - 44:17, 44:20
**whitelist** [1] - 41:11
**whole** [2] - 3:20, 44:19
**wife** [6] - 14:17, 15:2, 19:19, 23:25, 39:18, 47:17
**wife's** [1] - 49:19
**Williams** [1] - 57:5
**willingness** [1] - 65:18
**Wireless** [2] - 43:19, 55:12
**wish** [1] - 25:21
**woman** [3] - 25:17, 25:25, 60:8
**women** [4] - 25:22, 25:24, 26:9
**word** [4] - 28:11, 28:12, 37:12, 56:6
**words** [9] - 8:16, 14:4, 24:12, 25:12, 25:13, 48:6, 57:5, 60:15, 64:13
**workplace** [1] - 42:3
**world** [1] - 39:24
**worried** [2] - 22:11, 22:20
**worries** [1] - 25:11
**worth** [1] - 14:18
**wrap** [2] - 11:6, 67:11
**write** [2] - 6:18, 39:1
**writes** [3] - 28:20, 34:4, 58:8
**writing** [1] - 33:11
**written** [2] - 5:4, 62:14
**wrote** [2] - 18:20, 50:20

## Y

**year** [6] - 5:21, 9:1, 14:3, 25:7, 38:22, 55:9
**years** [9] - 6:2, 11:21, 16:19, 36:15, 38:25, 48:17, 53:20, 54:3, 54:6
**yesterday** [1] - 18:23
**YORK** [2] - 1:1, 1:16

**York** [6] - 1:5, 1:17, 1:19, 1:22, 63:24
**young** [2] - 19:18, 30:18
**yourself** [2] - 31:11, 39:22
**yourselves** [1] - 2:18

**Z**

**zero** [2] - 8:21, 45:19